David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE FINJAN HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 3:20-cv-04289 |
|  | <u>CLASS ACTION</u> |
|  | **AMENDED COMPLAINT** |
|  | Judge:   Hon. Edward M. Chen Courtroom 5 – 17th Floor |

Lead Plaintiff Robert Grier ("Lead Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### <u>NATURE OF THE ACTION</u>

1.      Lead Plaintiff brings this class action against Finjan Holdings, Inc. ("Finjan" or the "Company"), its President and Chief Executive Officer Philip Hartstein ("Hartstein"), and the former members of the Company's board of directors (collectively, the "Board", and, with Hartstein, the "Individual Defendants", and, with Finjan, the "Defendants") for their violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(e) and 78t(a), respectively. Lead Plaintiff's claims arise in connection with the tender offer by Fortress Investment Group LLC, through its affiliates (collectively "Fortress"), to acquire all the issued and outstanding shares of Finjan (the "Tender Offer").

AMENDED CLASS ACTION COMPLAINT

2.     The Tender Offer was made pursuant to an agreement and plan of merger dated June 10, 2020 (the "Merger Agreement"), pursuant to which, following the completion of the Tender Offer, an affiliate of Fortress merged with and into Finjan with Finjan surviving as a wholly owned subsidiary of Fortress (the "Merger"), and Finjan shareholders were cashed-out for a grossly inadequate $1.55 per share of Finjan stock they owned (the "Merger Consideration").

3.     On June 24, 2020, to convince Finjan shareholders to tender their shares, Defendants caused a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statement to be disseminated to Finjan's shareholders, which was subsequently amended and supplemented on July 8, 16, and 23, 2020 (as amended and supplemented, the "Recommendation Statement" or "RS"). As set forth below, the Recommendation Statement was materially false and misleading with respect to Finjan's financial projections and prospects, the value of shareholders' shares, and the fairness of the Merger Consideration.

4.     The Recommendation Statement provided a materially false and misleading valuation picture of Finjan by disseminating unreasonably low financial projections for 2020-2024 (the "Multiyear Projections"), which were used to frame the Merger Consideration as "fair." In reality, the Merger Consideration drastically undercompensated Finjan shareholders and did not provide them with anything close to the intrinsic fair value of their shares.

5.     The numbers reflected in the Multiyear Projections are contradicted by and inconsistent with statements made by the Company and its management leading up to the Merger, and reflect just a fraction of the actual value of the Company. Specifically, in December 2019, the Company stated it projected revenues of $200-$400 million for 2019-2022 for just its licensing and enforcement business line, yet the Multiyear Projections (spanning 2020-2024) only reflect $166 million in total revenue.

6.     The Multiyear Projections were created solely for use by Finjan's financial advisor, Atlas Technology Group LLC ("Atlas"), in conjunction with its fairness opinion *Discounted Cash Flow Analysis* ("DCF"). Without the Multiyear Projections, Atlas would have been unable to issue a fairness opinion, and Defendants would have been unable to claim that the Merger Consideration

provided shareholders with fair value for their holdings. Indeed, the other financial analyses performed by Atlas found that the Merger Consideration was unfair—as do similar analyses from published shareholders and financial analysts alike. Therefore, the only way Atlas was able to issue a fairness opinion and collect its $2.162 million fee was to utilize the unreasonable Multiyear Projections, which Defendants authorized Atlas to use despite knowing that the Multiyear Projections did not accurately reflect the Company's long-term financial prospects and value.

7.     As set forth below, the Multiyear Projections, the DCF Analysis and present value per share ranges predicated on the Multiyear Projections, statements conveying that the Multiyear Projections were reasonable, and statements touting the fairness of the Merger and the Merger Consideration, misled Finjan shareholders about the fair value of their shares and caused them to tender their shares and accept the unfair Merger Consideration.

8.     The Tender Offer expired on July 22, 2020, and Finjan shareholders were cashed out via the Merger for the inadequate Merger Consideration.

9.     For these reasons, and as set forth in detail herein, Defendants violated Sections 14(e) and 20(a) of the Exchange Act. Accordingly, Lead Plaintiff seeks to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Lead Plaintiff alleges violations of Sections 14(e) and 20(a) of the Exchange Act.

11.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has

1  minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

2  the defendant in any federal district court." *Id*. at 1316.

3        12.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

4  78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had

5  an effect in this District; (ii) Finjan maintains its principal place of business in this District and

6  each of the Individual Defendants either resides in this District or has extensive contacts within

7  this District; (iii) a substantial portion of the transactions and wrongs complained of herein

8  occurred in this District; (iv) most of the relevant documents pertaining to Lead Plaintiff's claims

9  are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants

10  have received substantial compensation in this District by doing business here and engaging in

11  numerous activities that had an effect in this District.

12  **CLASS ACTION ALLEGATIONS**

13        13.    Lead Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of

14  himself and the other former public shareholders of Finjan who were harmed by Defendants'

15  conduct alleged herein (the "Class"). Excluded from the Class are Defendants and any person,

16  firm, trust, corporation, or other entity related to or affiliated with any Defendant.

17        14.    This action is properly maintainable as a class action because:

18        a.    The Class is so numerous that joinder of all members is impracticable. As

19  of June 23, 2020, there were 27,832,485 shares of Finjan common stock outstanding, held

20  by hundreds to thousands of individuals and entities scattered throughout the country. The

21  actual number of public shareholders of Finjan will be ascertained through discovery;

22        b.    There are questions of law and fact that are common to the Class that

23  predominate over any questions affecting only individual members, including the

24  following:

25            i)    whether Defendants misrepresented material information in the

26            Recommendation Statement in violation of Section 14(e) of the

27            Exchange Act;

28

        ii)      whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

        iii)     whether Lead Plaintiff and other members of the Class suffered damages as a result of the Defendants' actions alleged herein;

c.     Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## PARTIES

15.     Lead Plaintiff was, at all relevant times, a shareholder of Finjan.

16.     Defendant Finjan is a Delaware corporation that maintains its principal executive office at 2000 University Avenue, Suite 600, East Palo Alto, California 94303. Prior to the Merger, Finjan's common stock traded on the Nasdaq under the ticker symbol "FNJN". Finjan survived the Merger as a non-publicly-traded, wholly owned subsidiary of Fortress.

17.     Defendant Philip Hartstein was, at all relevant times, the President and Chief Executive Officer ("CEO") of Finjan. Mr. Hartstein signed the Recommendation Statement.

18.     Defendant Daniel Chinn ("Chinn") was Chairman of the Board at all relevant times, and served as a director of the Company from June 2013 through the consummation of the Merger,

AMENDED CLASS ACTION COMPLAINT

served as a director of the Company's subsidiary, Finjan, Inc., since 2007 and was the CEO of Finjan, Inc. from 2010 until April 2014. He also served as a director (from 2006) of Finjan Software, Inc., a Delaware corporation and a former parent company of Finjan, Inc. and the chief executive officer (from 2010) of Finjan Software, Inc., until its dissolution in 2013. Chinn coordinated with the members of the Transaction Committee (Eric Benhamou and Michael Southworth) to oversee the Company's sales process.

19.    Defendant Eric Benhamou ("Benhamou") was a director of the Company from June 2013 through the consummation of the Merger, and served as a director of the Company's subsidiary, Finjan, Inc., since 2006.  Benhamou served on the Transaction Committee that the Board authorized to oversee the Company's sales process and make certain day-to-day decisions about the process. He also served as the Chairman of the Audit Committee. Mr. Benhamou is also Chairman and CEO of Benhamou Global Ventures, LLC, which he founded in 2003 to make activist investments in tech firms. Benhamou Global Ventures was one of the Company's largest investors owning approximately 2.5% of the Company's outstanding common stock.

20.    Defendant Glenn Daniel ("Daniel") was a director of the Company from April 2014 through the consummation of the Merger. He also served as the Chair of the Compensation Committee and a member of the Audit Committee.

21.    Defendant John Greene ("Greene") was a director of the Company from June 2018 through the consummation of the Merger. He is also a Partner, Managing Principal, and Portfolio Manager of Halcyon Capital Management LP (now named Bardin Hill Investment Partners LP) and shares primary portfolio management responsibilities for the firm. Halcyon/Bardin Hill was one of the Company's largest shareholders owning approximately 14.2% of the Company's outstanding common stock. Mr. Greene previously served as a board observer (prior to being appointed as a director) for Bardin Hill during their funds' ownership of the Company's Series A Preferred Stock and Series A-1 Preferred Stock.

22.    Defendant Harry Kellogg ("Kellogg") was a director of the Company from April 2014 through the consummation of the Merger. He also served a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

AMENDED CLASS ACTION COMPLAINT

23.    Defendant Gary Moore ("Moore") was a director of the Company from November 2015 through the consummation of the Merger.

24.    Defendant Alex Rogers ("Rogers") was a director of the Company from June 2013 through the consummation of the Merger, and served as a director of the Company's subsidiary, Finjan, Inc., since 2006. He also served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Mr. Rogers also serves as a managing director of HarbourVest Partners LLC. HarbourVest was one of the Company's largest shareholders owning approximately 15.5% of the Company's outstanding common stock.

25.    Defendant Michael Southworth ("Southworth") was a director of the Company from April 2014 through the consummation of the Merger.  Southworth served on the Transaction Committee that the Board authorized to oversee the Company's sales process and make certain day-to-day decisions about the process He also served as a member of the Audit Committee.

26.    Collectively, the Defendants identified in ¶¶ 17-25 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.    Background of the Company and the Transaction**

27.    Finjan operates a cybersecurity business focused on intellectual property licensing and enforcement, mobile security application development, and investing in cybersecurity technologies and intellectual property. The Company's operations are broken into three business lines: intellectual property licensing and enforcement, mobile security application development, and investing in cybersecurity technologies and intellectual property.  Licensing and enforcement of the Company's cybersecurity patent portfolio is operated by its wholly-owned subsidiaries Finjan, Inc. and Finjan Blue, Inc. The Company's mobile security business is operated through its wholly-owned subsidiary Finjan Mobile, Inc.

28.    The Company owns a portfolio of patents, related to software and hardware technologies that detect malicious code and thereby protect end users from identity and data theft, spyware, malware, phishing, trojans, and other web and network threats. The Company presently

derives most of its revenue from licensing agreements and the enforcement of patents in patent infringement litigation.

29.     Prior to the Merger, Finjan had a successful licensing and enforcement history, financial stability, and strong growth prospects.

30.     As of May 2020, Finjan had more than 50 organically-developed patents issued worldwide, enhanced by the acquisition of 90+ complementary patents from IBM, Trend Micro, and others, for which Finjan has generated over $350 million in licensing fees. The Company has an outstanding track record of patent validity and enforceability and a large pipeline of patent infringement cases.

31.     As of its most recent quarterly report, the Company carried no debt or preferred stock, had a cash balance of over $32 million, current assets over $36 million, and total assets over $48 million. On a per share basis, that represents values of $1.16 per share in cash, $1.30 per share in current assets, and $1.66 per share in total assets.

32.     Furthermore, Finjan generated $13.2 million in revenues for the year ended December 31, 2019, and $3.8 million in revenues during the quarter ended March 31, 2020.

33.     Moreover, Finjan was on the brink of a period of unprecedented growth of its licensing and enforcement revenue. In its December 2019 Investor Presentation, the Company stated that it expected to generate $200-$400 million in licensing and enforcement revenue over the next three years:

AMENDED CLASS ACTION COMPLAINT



34.     The December 2019 Investor Presentation was filed with the SEC on December 9, 2019, and attached to a Form 8-K signed by Defendant Hartstein. The 8-K stated that the presentation would be used in connection with presentations to investors, analysts and others. Accordingly, each of the Individual Defendants knew of the Presentation and its contents.

35.     Furthermore, on December 5, 2019, the full Board met with members of management and the Company's financial advisors, and discussed the Company's cash balance. The Company's cash balance was referenced on several slides in the December 2019 Investor Presentation. The Board also met with management and its financial advisors on December 15, 2019. And on February 26, 2020, the Board authorized the Company to publicly announce the close of its strategic review process so that management and the Board could better focus on operating the Company's business plan, which had been detailed in the December 2019 Investor Presentation.

36.     The Company was also entering a period of new growth for Finjan Blue—its patent acquisition and development venture with IBM. In 2017 and 2018 the Company, through Finjan Blue, entered into two Patent Assignment and Support Agreements with IBM, wherein it acquired the rights to over 90 IBM patents in the security sector. Previously, Finjan Blue served as incremental value to many of the Finjan, Inc. licenses; however, during the Company's March 4, 2020 earnings call, the Company announced that it was entering into independent valuation discussions with the Finjan Blue patents of the underlying portfolio:

Sam Rebotsky

Good afternoon, Phil. And this is changed, now that we're on our feet to try to do things. Could you tell me we've paid money for the IBM patents? Has that produced any income so far?

Phil Hartstein

Hi, Sam. Thanks for the question. Yes. So, the way that we -- and I can leave it up to Javen for the technical accounting parts of it. When we talk about the IBM portfolio being incremental in licenses that we've granted and bringing those patents into the Finjan portfolio of companies, for example, I think all the way back to our FireEye license which there was a purchase price allocation, I think at that point at least $2 million of that license went and was allocated specifically for the IBM patent. So, as we go through these license events with new licensees where their Finjan Blue patents are included, yes, there is some allocation for those. As you just heard in the remarks though, we've also now moved from the Finjan Blue patents being purely incremental in value to what would normally be achievable under the Finjan, Inc. license, to now actually driving their own programs, their own licenses where the focus is first on the IBM patents, the Finjan Blue patents instead of Finjan, Inc. patent leaving the discussion. So, this is a new transition for us.

…

Mike Crawford

Thanks. What's your confidence that these Finjan Blue license discussions will lead to deals in excess of the $4 million you have remaining to pay to IBM over the next two years?

Phil Hartstein

To be specific, I'd tell you that we would never make an investment we didn't think we could recoup on investment. And we don't file a lawsuit that we don't think we can win a trial. I would say that, we're probably in the neutral investment parameters now with how much we've made on the investment basis relative to that for which we received in licensing, maybe a little bit in plus -- in the plus territory. So, I would tell you, I have -- based on what I've seen in the licensing pipeline, I have above an average to possibly even high expectations that that portfolio will certainly yield more profit than it did expense.

37.     The Company has also expressed high expectations for its developing mobile cybersecurity division—Finjan Mobile. As the Company's Chief Financial Officer Jevan Anderson ("Anderson") stated in the March earnings call: "Now, I'd like to turn to Finjan Mobile and our mobile browser of VPN offering InvinciBull. With over 2 million download, we continue to innovate and grow our patent portfolio, protect our investment, and inventions in Finjan Mobile. In fact, we issued another related patent just last week." This rosy outlook for Finjan Mobile was echoed and elaborated on in the Company's most recent 10-Q:

AMENDED CLASS ACTION COMPLAINT

Given our experience of over 20 years in the cybersecurity market we have had the benefit of actively participating in the progression on how technology has moved to meet the new threats and demands. We believe this puts us in a unique position to make observations and determine the best course of action in order to make investments in new developing technologies. There is still a limited appreciation for how much personal data is being pushed out over the internet for anyone to capture and unlike desktops and laptop computers, mobile devices do not have the same kind of access to security. We believe this represents a unique opportunity for Finjan to develop products for consumer mobile devices that were once only available to our enterprise customers. As such, we are using and building upon our current patented technology and migrating it into the mobile platform so consumers can have greater control of their security and personal information.

38. This optimism—across product lines—was not hampered by the global pandemic. In its May 2020 Investor Presentation, the Company reiterated that while it had closed its strategic review process and no transaction was consummated, it remained "confident in [its] path forward as [an] independent entity."

39. In the same investor presentation, the Company further stated that its response to the COVID-19 Pandemic was "Business as Usual" with a cut back on non-legal operating expenses and potential savings derived from the CARES Act:

## Finjan's Response to COVID-19 Pandemic

**Business as Usual**
- Continue conversations with prospective licensees to arrive at a fair value license
- Working with current litigants as we try to find a path towards settlement

**Monitoring Expenses**
- Addressing overall spend to align with shifting litigation calendar; scaling back operating nonlegal expenses by 25%
- Pursuing potential financial benefit of the CARES Act for Finjan as well as potential SBA and PPP loans

**Employees Remote and Safe**
- Employees effectively working remotely during Shelter-in-Place
- Productive team makes it efficient to manage the business remotely

40. The May 2020 Investor Presentation was filed with the SEC on May 13, 2020, via a Form 8-K signed by Hartstein which stated that the presentation would be used in connection

1  with presentations to investors, analysts and others. Accordingly, as directors or CEO of the

2  Company, each of the Individual Defendants knew of the presentation and its contents.

3    41.   COVID-19's lack of impact on the Company's long-term prospects is further

4  supported by the changes Hartstein and his management team made to the Management

5  Projections[1] from April 2020 to May 2020—they made no changes to its revenue projections and

6  instead cut costs, resulting in more profitable projections for Finjan.

7    42.   Furthermore, as an investor who closely followed Finjan explained in an article

8  entitled "COVID-19 or not, Finjan should do well," the Company was "realistically worth 3x more

9  than [its then] current share price and potentially 10x more." This was so in light of the Company's

10  licensing pipeline and the fact that there are 9-10 trials expected over the next 3 years with

11  significant potential wins (and thus dramatic cash inflows) resulting from each.

12    43.   Furthermore, as explained below, based upon the Company's own expected

13  licensing and enforcement revenues of $200-$400 million between 2019-2022, the Company's

14  shares were worth $4.36 utilizing the most conservative $200 million estimate, and $15.50 per

15  share utilizing the $400 million estimate.

16    44.   Defendants were so confident in Finjan's prospects and ability to execute its stand-

17  alone plan (as set forth in the December 2019 Investor Presentation) that they initially rejected

18  proposals far superior to the Merger Consideration. On March 4, 2020, at which point the Company

19  had just ended discussions with a bidder (referred to as Party B) offering $2.75 per share, Finjan

20  issued a press release officially closing the ongoing sales process. Defendant Chinn stated: "As

21  our stockholders are well aware, the Board of Directors has been thoroughly evaluating all of our

22  strategic options for Finjan for over a year. After a broad process and careful consideration of the

23  various alternatives, the Board believes remaining an independent entity is currently the best

24  available outcome for Finjan stockholders."

25

26

27  [1]  As defined in the Recommendation Statement, the "Management Projections" were the financial
projections for the remainder of fiscal year 2020 that Finjan's management prepared on April 25,
28  2020 and updated on May 27, 2020 regarding the Company's future operations as a standalone
company. RS at 37.

AMENDED CLASS ACTION COMPLAINT

45.     Similarly, during the Company's March 4, 2020 earnings call, Defendant Hartstein stated: "As you most likely read in press release today, this process is now formally concluded. While we didn't consummate a transaction, we are confident in our path forward as an independent entity."

46.     After Defendants announced the close of the strategic review process, Party B continued to exert pressure on Defendants to sell Finjan. For example, on April 1, 2020, Party B informed Mr. Chinn of its intent to purchase a sizeable block of Finjan shares in the market.

47.     On April 5, 2020, the Board asked Company management to perform a liquidation value analysis.

48.     On April 12, 2020, less than a month after Defendants had deemed the strategic review process closed, members of Finjan management contacted representatives of Fortress to inquire whether they had an interest in reengaging in acquisition discussions.

49.     On April 13, 2020, the Company and Party B entered into a letter agreement providing Party B the exclusive right to negotiate with the Company through April 20, 2020. Such letter agreement also included a representation that Party B's beneficial ownership of the Company was less than 5% and provided for a standstill through April 20, 2020.

50.     Following the expiration of the exclusivity period with Party B on April 20, 2020, Atlas contacted Fortress on April 21, 2020 to explore whether it had interest to reengage in discussions to acquire the Company. Throughout late April and early May members of the Board communicated with representatives of Party B regarding the possibility and timing of a potential transaction.

51.     On April 29, 2020, Party B proposed an asset purchase rather than an acquisition of the Company.

52.     On April 30, 2020, representatives of Atlas spoke with representatives of Fortress, which confirmed its interest in reengaging in the process and indicated its ability to move quickly toward a transaction.

53.     On May 4, 2020, the Board held a telephonic meeting, which was also attended by representatives of management and financial advisors. The Board discussed a call that

1   Mr. Southworth had with an executive from Party B. Atlas also reported interest by Fortress in

2   reengaging in the process. The Board discussed Party B's desire to pursue an asset purchase. Just

3   two months after determining it was in the best interests of shareholders to pursue the Company's

4   standalone plan, the Board suddenly instructed Atlas to continue to explore whether Fortress had

5   an interest in a transaction. Fortress did, because it knew Finjan was trading at a grossly

6   undervalued price and was eager to quickly acquire the Company on the cheap.

7        54.    Hartstein and the Company continued to convey their confidence in the Company's

8   stand-alone plan and strong financial prospects (as set forth in the December 2019 Investor

9   Presentation) during the May 13, 2020 earnings call. With respect to the Company's licensing

10  business, Hartstein and CFO Anderson stated:

11  **Phil Hartstein:**

12  Our prospective licensing program continues and if anything more aggressively as
    we continue to pursue unlicensed use of Finjan's patented technologies and enforce
13  pricing protection provisions in our existing contracts with licensees."

14  \*\*\*

15  Yes. The licensing pipeline is still active. In fact, it's probably where we're spending
    most of our time today because a lot of the litigations are sort of on fixed time lines
16  and many of those interactions are being handled by outside counsel. So our
    attention is focused on licensing really in two buckets.
17

18  First would be, I think, the obvious, which is the category of companies who may
    be just coming online using Finjan's patented technologies or maybe even more
19  protracted licensing discussions, but there's a number of those that are ongoing.
    And so our historical practice is that we don't really announce the progress of those
20  until those deals actually get struck. But those are sort of those episodic income
    events that you see sort of spike on our revenues once reported.

21                                        …

22  **Jevan Anderson:**

23  Yes. Let me take the first part there. I mean, we are constantly monitoring our cash
    position, Sam. We're very sensitive to what our cash balance is. At $32 million, we
24  have more than enough cash to survive through certainly the next four quarters and
    well beyond. So we're not concerned.

25       55.    On the same call, and with respect to the Company's litigation activity, Defendant

26  Hartstein indicated that he believed while COVID-19 had delayed the trials against ESET and

27  Cisco until later in 2020, nothing had changed regarding the Company's long-term litigation

28  outlook:

AMENDED CLASS ACTION COMPLAINT

Additional timing issues have presented themselves, but scheduling of our preexisting docketed matters is beginning to normalize. I must say that I am pleased with the court's swift action during the shutdown to make certain adjustments to the courtroom settings and procedures in an effort to continue operating.

As everyone now knows, in the first half of this year, we were approaching two significant trials. ESET was up in March, followed by Cisco in June. Just as we were being introduced to the COVID pandemic, our first trial with ESET concluded in a mistrial after a full week of testimony. Just yesterday, we had a scheduling conference with the court to discuss a new trial date and new parameters for courthouse and courtroom interaction. Unfortunately, the trial rescheduling was pushed again to a new case management conference set for July 23 as the Southern District Court has extended its closure until mid-to-late June.

In our Cisco case, we were originally scheduled to start our trial on June 1 but after conferring with the court we learned that they aren't planning to reopen until that date. To provide some scheduling buffer, the start date of that trial has been pushed back a few weeks and we'll now begin on June 22. Both trials are significant near-term events for Finjan and we are working diligently to keep both cases on track while continuing to pursue the earliest feasible trial dates.

Since our last call in early March, during the early days of the pandemic, much of the outstanding case updates have remained largely unimpacted, notably Juniper, Rapid 7, SonicWall, Qualys, Palo Alto Networks and Fortinet. Regarding Trustwave, we filed a patent infringement complaint in Delaware Federal Court, escalating the already filed breach of contract dispute over unpaid royalties, which has also shifted from state court and merged into our federal case.

In addition to the Cisco and ESET trials currently set for 2020, we still anticipate Rapid 7 and SonicWall to occur in the first half of 2021. And three more, Qualys, Palo Alto Networks and Fortinet in 2022. Importantly, our patents remain as strong as ever. We prevailed at the PTAB in three IPR challenges with ESET, Juniper Networks and Unified Patents.

56.     In other words, on the May 13, 2020 earnings call, Hartstein indicated that he and the Company did not expect COVID-related litigation delays to meaningfully impact the Company's long-term outlook.

57.     During the May 13, 2020 earnings call, Finjan's CFO Anderson reiterated Hartstein's confidence in the Company's litigation and licensing related opportunities, stating:

Part of our cash management, we diligently pursue tax efficiencies accordingly, importantly we are taking advantage of the many corporate tax divisions in the COVID CARES Act recently signed into law. This will bring an additional $3.2 million of cash onto our balance sheet later this year, due to a refund on taxes paid on our profits in 2018, where the details can be found in Note 10 of our 10-Q file this morning.

Our focus on cost management has allowed us to maintain a stable balance sheet in the face of investing in upcoming trial schedule. We feel confident that our

AMENDED CLASS ACTION COMPLAINT

litigation and licensing programs will yield additional cash generating events for the company. As mentioned on our last call, we will continue to evaluate alternatives on how to best use any excess cash from operations to deliver value to our shareholders. This could take form and stock buybacks, special dividends or similar mechanisms. We'll be limited as to what we can do during these uncertain times in the midst of upcoming trials. But we will work with our Board and Advisors to establish a plan and communicate that to shareholders when appropriate.

58.     Inexplicably, three months after deeming the Company's strategic review process closed, on June 10, 2020, Defendants agreed to accept the grossly inadequate $1.55 Merger Consideration, which represented only $0.39 per share above the Company's cash value and a discount to the Company's total asset value net of debt. Moreover, the derisory $1.55 Merger Consideration represents a 35% discount to the Company's high trading price at the beginning of 2020.

59.     In other words, as set forth above, the Merger Consideration was objectively unfair, and Defendants knew this because they were fully aware of the above-referenced financial metrics indicating that the Merger Consideration was objectively unfair, including the implied value of the Company based upon Defendants' own expectation that Finjan would generate $200-$400 million in just licensing and enforcement revenues between 2019-2022.

60.     Hartstein and Finjan's CFO Jevan Anderson maintained their lucrative jobs with Finjan following the consummation of the Merger.

61.     Also, on June 10, 2020, concurrently with the execution of the Merger Agreement, the Company's largest shareholders, including hedge funds, the Individual Defendants, and certain Company officers entered into support agreements locking up 28% of the Company's outstanding common stock in favor of the Merger.

62.     In conjunction with the Merger, Fortress also insisted on, and Defendants agreed to, deal protection provisions including an unreasonably high termination fee of $1,353,709 and an expense reimbursement of up to $1,000,000, both of which the Company would be required to pay to Fortress in the event it sought to terminate the Merger Agreement and pursue a superior proposal.

## II.     The Materially False And Misleading Recommendation Statement

63.     Each of the Defendants reviewed the Recommendation Statement before it was disseminated to the Company's shareholders, as they each had a duty to review the Recommendation Statement and ensure it did not contain any materially false or misleading statements. Defendants caused the materially false and misleading Recommendation Statement to be filed with the SEC and disseminated to Finjan's shareholders. Indeed, the Recommendation Statement could not have been disseminated without Defendants' approval, and it repeatedly discusses the actions and beliefs of the full Finjan Board, and states that "for the reasons described in" the Recommendation Statement "the Board hereby unanimously recommends that the Company's stockholders accept the Offer and tender their Shares in the Offer." RS at 13. As set forth herein, the Recommendation Statement contained materially false and misleading statements which influenced Finjan shareholders' decision concerning whether to tender their shares, in violation of Sections 14(e) and 20(a) of the Exchange Act.

64.     In conjunction with approving the Merger, Defendants elected to obtain a "fairness opinion" from a financial advisor, Atlas. Fairness opinions are not required by law, but are often obtained by boards of directors anyway so that they can be touted to shareholders as evidence that the merger they approved is purportedly fair. As has been well documented, fairness opinions are often "deeply flawed", as they "are frequently prepared utilizing methodologies [and inputs] that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1573-78 (2006). As one scholar put it, "obtaining a fairness opinion has become like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate." Jonathan R. Macey, *The Regulator Effect In Financial Regulation*, 98 CORNELL L. REV. 591, 618-19 (March, 2013).

65.     In connection with Finjan's strategic planning process, Defendant Hartstein and his management team prepared financial projections reflecting the Company's anticipated future operations as a standalone entity for the remainder of fiscal year 2020 (the "Management

AMENDED CLASS ACTION COMPLAINT

Projections"). However, Atlas needed at least four additional years of projections to perform the most important valuation analysis underlying a fairness opinion, the Discounted Cash Flow Analysis ("DCF"). Indeed, five-year forecasts are routinely utilized in conjunction with fairness opinions supporting mergers.[2]

66.     Accordingly, Hartstein and his management team prepared financial information and assumptions, told Atlas the financial information and assumptions were reasonable, and instructed Atlas to utilize such financial information and assumptions to derive projections for revenue, operating expenses, and unlevered free cash flow through 2024 (referred to herein as the Multiyear Projections).

67.     The Individual Defendants directed and approved Atlas's use of the Multiyear Projections for its DCF Analysis. However, as set forth herein, Defendants did not genuinely believe in the Multiyear Projections, and knew that the numbers reflected therein were far below their genuine expectations regarding the Company's future financial performance.

68.     The numbers reflected in the Multiyear Projections were entirely inconsistent with Hartstein's and the Company's prior statements regarding their genuine beliefs about the Company's future prospects.

69.     As set forth in the Recommendation Statement, the Multiyear Projections were predicated on the following inputs and assumptions:

> In calculating the standalone equity values implied by the discounted cash flow analysis, Atlas used Company Projections for the unlevered cash flows for the remainder of the year ending December 31, 2020. In addition, Atlas used the following assumptions, based on and derived from information provided by management, and that management confirmed were reasonable as of the date of Atlas' opinion, to forecast the unlevered free cash flows for calendar years 2021 through 2024:
>
> • the Offer and the Merger close by July 31, 2020;

---

[2]   "Discounted cash flow (DCF) forms the core of finance….Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*, Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010.

AMENDED CLASS ACTION COMPLAINT

• $140 million in cumulative litigation-related revenue spread equally across the years 2021 to 2024;

• $20 million in cumulative licensing and other revenue over the four-year period with $6 million per year realized in 2021 and 2022 and $4 million per year realized in 2023 and 2024;

• gross margin of 85.7% in 2021 and gross margins of 90.0% in each subsequent period; and

• operating expenses based on levels forecast in the Company Projections for 2020; litigation expenses from 2021 to 2024 based on historical billings and the expected billings from its law firms assuming cases are finalized over the duration of the forecast period; a reduction from historical levels for expenses related to the Company's mobile portfolio; and all other expenses (finance and operations) held steady from 2021 to 2024 consistent with managing the patent portfolio in a run-off scenario.

RS at 32.

70.     On July 16, 2020, Finjan filed Amendment No. 2 to the Recommendation Statement ("Amendment No. 2"), which disclosed a more complete summary of the Multiyear Projections:

|  | 2H 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| **Total Revenue** | $ 6,000 | $ 41,000 | $ 41,000 | $ 39,000 | $ 39,000 |
| **Operating Expenses** | $ 13,588 | $ 25,643 | $ 25,643 | $ 23,643 | $ 21,643 |
| **Unlevered Free Cash Flow** | $ (5,088) | $ 9,138 | $ 8,105 | $ 8,249 | $ 9,689 |

71.     The Amendment No. 2 also reiterated that the revenue, operating expense, and unlevered free cash flow projections were derived from information that Finjan management had provided to Atlas and confirmed as reasonable.

72.     The total revenue figures for 2020-2024 amount to only $166 million, and presented a false picture of the true value of the Company and its prospects. Just a few months earlier, in December 2019, the Company indicated it expected to generate $200-$400 million for licensing and enforcement revenue alone. And, as set forth above, during the time between when the $200-$400 million licensing and enforcement revenue estimate was issued (December 2019) and the creation of the Multiyear Projections (in or around May/June 2020), the Company and Hartstein repeatedly made positive statements about the Company's financial condition, the current and future state of its licensing and enforcement pipeline, and the Company's other growing business lines, Finjan Blue and Finjan Mobile.

73.     Simply put, in December 2019 the Company stated that it expected to generate $200-$400 million over the next three years from its licensing and enforcement revenue alone. And, in the months thereafter, the Company and Hartstein continued to express confidence in the Company's financial prospects, and indicated that COVID-19 had not meaningfully impacted the Company's prospects or valuation picture. Yet, when Atlas needed multi-year projections to render a fairness opinion in June 2020, Defendants authorized the creation of and permitted Atlas to utilize the Multiyear Projections, which reflected only $166 million in total revenues across the entire company (*i.e.*, all three business lines) between the second half of 2020 and 2024. The glaring difference between the revenue expectations that the Company announced in December 2019 and those reflected in the Multiyear Projections are irreconcilable, and were not justified by any meaningful change to the Company's prospects during the pertinent time period.

74.     The materially false and misleading Multiyear Projections were utilized by Atlas to conduct its DCF Analysis, which resulted in materially false and misleading illustrative present value per share ranges of $1.27 to $1.68 and $1.42 to $1.55, which Defendants authorized to be included on page 33 of the Recommendation Statement. The unreasonably low implied valuation ranges (which were predicated on the unreasonably low Multiyear Projections), further misled Finjan shareholders regarding the fair value of their shares.

75.     Based on the facts set forth above, including the $200-$400 million revenue expectation set forth in the December 2019 Investor Presentation and the various statements made by Hartstein and Andersen during the March and May 2020 earnings calls conveying continued confidence in the Company's long-term standalone alone plan and minimizing COVID-19's impact on the Company's long-term prospects, Defendants knew that the Multiyear Projections severely and unreasonably discounted the Company's future earning potential and presented a falsely and misleadingly low valuation picture of the Company. Indeed, as directors or CEO of the Company, each of the Individual Defendants was aware of the contents of the December 2019 and May 2020 Investor Presentations and management's statements and views conveyed during the Company's earnings calls.

76.     Atlas' DCF Analysis using the unreasonably low Multiyear Projections was the only valuation analysis Atlas performed that showed the Merger Consideration to fall within a range of "fairness." Accordingly, without the false and misleading Multiyear Projections, Atlas could not have rendered a fairness opinion.

77.     Defendants did not actually believe in the Multiyear Projections, and knew they were false and misleading because they: (i) were predicated upon unreasonable assumptions and were meaningfully below the projections reflected in the December 2019 Investor Presentation, which were prepared in the ordinary course of business and reflected the Company's and Individual Defendants' actual expected financial outlook; (ii) were inconsistent with the Company's, Hartstein's, and Anderson's positive statements made during the months after December 2019 and preceding the announcement of the Merger regarding the Company's positive financial trends, strong growth prospects, and COVID-19's lack of impact on the Company's long-term financial prospects; and (iii) were not used during the Defendants' negotiation with bidders and were created solely for use in conjunction with Atlas's DCF Analysis. Furthermore, all of the other valuation analyses conducted by Atlas showed that the Company's implied value per share completely exceeded the Merger Consideration,[3] and Defendants knew that the only valuation analysis that Atlas performed for which the Merger Consideration fell within a range of fairness was the DCF Analysis, which Defendants knew was predicated on the unreasonably low Multiyear Projections. Simply put, Defendants knew that all of Atlas's valuations aside from the unreasonable DCF Analysis showed that the Merger Consideration was unfair, and they thus did not genuinely believe that the Merger and Tender Offer were fair to shareholders. Accordingly, each of the following statements were false and misled Finjan shareholders regarding the Company's future prospects and value.

78.     For the foregoing reasons, the following statements in the Recommendation Statement were materially false and misleading to Finjan's shareholders:

---

[3]   Specifically, the Premiums Paid Analysis reflected an implied per share range of $1.56 to $1.64, and the Selected Public Company Trading Multiples Analysis resulted in an implied price per share of $1.62 to $1.63.

AMENDED CLASS ACTION COMPLAINT

i.   The Multiyear Projections themselves (RS at 32, Amendment No. 2), which were false and misleading because Defendants genuinely believed that the Company would generate revenues and cash flows meaningfully in excess of the numbers set forth therein, the projections were predicated on unreasonable assumptions about Finjan's future financial performance and were undercut by facts about the Company's actual and potential levels of operation, and they thus presented a materially defective picture of the Company's value and prospects;

ii.  The DCF Analysis summary, including the resulting implied present value per share ranges (RS at 32-33), which were materially false and misleading because the analysis and resulting value ranges were based on the unreasonably low Multiyear Projections, which were drastically below Defendants' genuine expectations regarding the Company's future, and therefore presented the value of shareholders' shares as being far lower than their genuine fair value; Furthermore, the DCF Analysis Summary set forth the false and misleading assumptions underlying the false and misleading Multiyear Projections;

iii. The statements conveying that the Multiyear Projections and their underlying assumptions were "reasonable": (a) RS at 32: "Atlas used the following assumptions, based on and derived from information provided by management, *and that management confirmed were reasonable* as of the date of Atlas' opinion, to forecast the unlevered free cash flows for calendar years 2021 through 2024; (b) Amendment No. 2 – "Based on the methodology above, revenue and expense estimates were derived by Atlas *from information provided and confirmed by management as reasonable.* Unlevered free cash flow estimates were calculated by Atlas based on those inputs." These statements were materially false and misleading because, as set forth herein, Defendants did not genuinely believe that the Multiyear Projections and the assumptions upon which they were generated were reasonable, as Defendants knew that the Company's long-term prospects were

accurately reflected by the significantly higher projections set forth in the December 2019 Investor Presentation; and

iv. The statements that the Board believed "that the Offer, the Merger and the other transactions contemplated by the Merger Agreement [were] fair to" the Company's stockholders (RS at 12, 24, 29) which were materially false and misleading because the Individual Defendants did not genuinely believe that the Merger was fair to the Company's stockholders, as numerous financial metrics of which the Individual Defendants were aware indicated that the fair value of shareholders' shares exceeded the Merger Consideration, and the Individual Defendants knew that all of Atlas's valuations aside from the DCF Analysis showed that the Merger Consideration was below the implied value of shareholders' shares, and that the DCF Analysis was thus the only valuation analysis that could have purportedly justified Atlas's fairness opinion and it was predicated on the unreasonably low Multiyear Projections which Defendants did not genuinely believe in.

79.     These misrepresentations in the Recommendation Statement are material because they directly relate to the value of Finjan shares and the fairness of the Merger.

**III.     By Authorizing the Materially False and Misleading Recommendation Statement, All the Defendants Were Negligent**

80.     As directors or CEO of the Company, each of the Individual Defendants had a duty to review the Recommendation Statement before they authorized its dissemination to ensure it did not contain any materially false or misleading statements. The Individual Defendants failed to fulfill their duty by allowing the Recommendation Statement to contain the materially false and misleading statements referenced above. As a result, shareholders were misled into tendering their shares, thereby causing them to receive less than full value for their shares and lose out on millions of dollars of value in the Company.

81.     Each Individual Defendant was negligent because, as directors or CEO of the Company, they were responsible for the contents of, and significantly involved in the preparation and dissemination of, the Recommendation Statement. Furthermore, as directors or CEO of the

Company, each of the Individual Defendants was aware of the projections set forth in the December 2019 Investor Presentation, and management's comments and views regarding the Company's financial condition and prospects that were conveyed during the Company's earnings calls. Therefore, each of the Individual Defendants was aware of the fact that the Multiyear Projections significantly slashed the Company's revenue projections as set forth in the December 2019 Investor Presentation, despite the fact that such a significant slash was in no way warranted or justified by the Company's and management's outlook or any changes to the Company's long-term business prospects. The Individual Defendants also reviewed the financial analyses and fairness opinion with Atlas, knew that the sole purpose for the creation of the unreasonably low Multiyear Projections was for Atlas to generate a fairness opinion, and knew that Atlas's DCF Analysis was predicated on the unreasonably low Multiyear Projections. Nevertheless, Defendants negligently approved and authorized the dissemination of the Recommendation Statement, which contained the materially false and misleading Multiyear Projections and related false and misleading statements set forth above.

82.     Instead of acknowledging that the Multiyear Projections were inappropriate for use in valuing the Company because they was predicated on unsound and unreasonably low assumptions and inputs, the Individual Defendants allowed Atlas to utilize the Multiyear Projections for purposes of its valuations, and negligently allowed the resulting materially false and misleading valuations to get disseminated to shareholders in the Recommendation Statement.

**IV.     The Materially False and Misleading Recommendation Statement Caused Finjan Shareholders Financial Harm**

83.     The Merger, which could not have been accomplished without the materially false and misleading Recommendation Statement, extinguished Finjan shareholders' ownership of Finjan for a price well below fair value.

84.     Numerous sources indicate that fair value of Finjan stock far exceeded the Merger Consideration.

85.     First, the Merger Consideration represented a discount to the Company's then-current asset and total asset value net of debt—which means that foregoing all future revenue, the

Merger Consideration was less than the then-current value of the Company's existing assets. Moreover, the derisory $1.55 Merger Consideration represented a 35% discount to the Company's $2.36 high trading price at the beginning of 2020.

86.     Second, a month before the announcement of the Merger, a sophisticated Finjan investor, Dmitriy Kozin, had an article published on *Seeking Alpha* finding the $1.50 share price to severely undervalue Finjan. Citing to public statements made by Company and their management, Mr. Kozin found the shares to be worth between 4.8x-10x the Merger Consideration.

87.     Using a "conservative" case assuming the low end of the expected revenue range of $200 million from 2020-2022 with SG&A of $25M per year for 3 years and the cost of revenues at 17%, approximate expenses ($75M+$34M) equal $109 million. The net income over those 3 years becomes $91 million or $3.30 per share. Assuming even distribution and a tax rate of 28%, in line with prior years, earnings per share would be $0.80 per year.

88.     Alternatively, the "bullish" scenario assuming the top end of the expected revenue range of $400 million over 3 years with SG&A of $25M per year for 3 years and the cost of revenues at 17%, approximate expenses ($75M+$51M) equal $126 million. The net income over those 3 years becomes $274 million or $9.96 per share. Assuming even distribution and a tax rate of 28%, in line with prior year, earnings per share would be $2.39 per year.

89.     Even when completely disregarding any potential revenues from Finjan Blue, Finjan Mobile, or any other non-licensing revenues, excluding the potential for revenues greater than projected $200-400 million range, and assuming no share buybacks, the Company's shares were severely underpriced at $1.50 per share. In the "conservative" scenario, adding the book value of $1.16 to only 4x earnings per share of $0.80 yields a value of **$4.36** per share. In the "bullish" scenario, assuming a mere 6x multiple yields a value of **$15.50** per share:

|  | Revenue | SG&A | Costs | EPS | Book value per share | P/E | Share Value |
|---|---|---|---|---|---|---|---|
| Conservative | $200M | $75M | $34M | $0.80 | $1.16 | 4 | $4.36 |
| Bullish | $400M | $75M | $51M | $2.39 | $1.16 | 6 | $15.50 |

90.     The average of the two scenarios is **$9.93**, or $8.78 if you ignore the current tangible book value (mostly in cash and equivalents). These numbers would obviously be even

AMENDED CLASS ACTION COMPLAINT

greater if they were to account for non-licensing revenue or if there are any buybacks, however modest. And as publicly stated by the Company, Finjan's long-term business should be virtually unaffected by any potential recession and minimally impacted by COVID-19.

91.   Third, using the Management Projections, Atlas found that the value of the Company **exceeded** the Merger Consideration in both their *Selected Public Company Trading Multiples Analysis* and *Premiums Paid Analysis*, which indicated that the Company's shares were worth up to $1.64 and $1.63, respectively.

92.   Fourth, prior to the Merger, financial analysts were bullish on Company and its future success. Investor Observer, a financial investment website, has demonstrated interest in the Company by saying in its May 18, 2020 article, "the average rating from Wall Street analysts, FNJN stock has a mean target price of $5. This means analysts expect the stock to rise 252.11% over the next 12 months." This optimism came from an aggregate analysis across the industry. The $5 price target is $3.45 above the Merger Consideration, further indicating that shareholders suffered economic loss as a result of the materially false and misleading Recommendation Statement that was utilized to procure approval of the unfair Merger.

## COUNT I

**Against Finjan and Hartstein for Violations of Section 14(e) of the Exchange Act**

93.   Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

94.   Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

95.   Finjan and Hartstein violated this clause of Section 14(e) because they negligently authorized the Recommendation Statement to be disseminated to Finjan shareholders in order to solicit them to tender their shares in the Tender Offer, and the Recommendation Statement

1   contained untrue statements of material fact that a reasonable and diligent chief executive officer

2   would have corrected prior to signing and disseminating the Recommendation Statement.

3       96.    Finjan and Hartstein were negligent in allowing the Recommendation Statement to

4   be disseminated with the above-referenced materially misleading statements regarding the

5   Company's projections, the value of the Company, and the purported fairness of the Merger. As

6   the CEO of Finjan and signatory of the Recommendation Statement, Hartstein had a duty to review

7   the Recommendation Statement before it was disseminated to the Company's shareholders to

8   ensure that it did not contain untrue statements of material fact. Hartstein was negligent in carrying

9   out their duty because, as set forth herein, the Recommendation Statement contains materially false

10  and misleading statements.

11      97.    Finjan is imputed with the negligence of Hartstein, who was the CEO and President

12  of the Company.

13      98.    As a direct result of Finjan and Hartstein's negligent preparation, review, and

14  approval of the false and misleading Recommendation Statement, Finjan shareholders were

15  induced to tender their shares and accept the inadequate Merger Consideration. The false and

16  misleading Recommendation Statement used to solicit the tendering of shares impeded Finjan

17  shareholders from making a fully informed decision regarding the Tender Offer and was an

18  essential link in consummating the Merger, which deprived them of fair value for their Finjan

19  shares.

20      99.    Prior to the dissemination of the materially false and misleading Recommendation

21  Statement, Finjan and Hartstein were aware of the above-referenced facts and financial

22  information regarding Finjan's expected future financial performance and the true value of the

23  Company, which indicate that the Multiyear Projections were unreasonably low and that the

24  Merger was financially unfair to the Company's shareholders.

25      100.   As a direct and proximate result of the materially false and misleading

26  Recommendation Statement Finjan and Hartstein authorized to obtain shareholder approval of the

27  Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the

28

AMENDED CLASS ACTION COMPLAINT

1  difference between the value they received as a result of the Merger and the true value of their
2  shares) in an amount to be determined at trial.

3  ## COUNT II

4  **Against Defendant Daniel Chinn for Violations of Section 14(e) of the Exchange Act**

5  101.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth
6  herein.

7  102.    At all relevant times Chinn was Chairman of the Board, and he served as a director
8  of the Company from June 2013 through the consummation of the Merger. Chinn, along with
9  Individual Defendants Benhamou and Southwick, was delegated the power of overseeing the
10 Company's sales process and making certain day-to-day decisions about the process. Chinn was
11 present at meetings of the Transaction Committee and between the Transaction Committee,
12 management, and Atlas on October 29, 2018, February 11, 2019, April 9, 2019, February 8, 2020,
13 February 11, 2020, February 12, 2020. Chinn also attended meetings with and engaged in
14 communications with Party B on February 18, 2020, April 1, 2020, and April 6, 2020.

15 103.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to
16 make any untrue statement of a material fact or omit to state any material fact necessary in order
17 to make the statements made, in the light of the circumstances under which they are made, not
18 misleading . . . in connection with any tender offer or request or invitation for tenders, or any
19 solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."
20 15 U.S.C. § 78n(e).

21 104.    Chinn violated this clause of Section 14(e) because he negligently authorized the
22 dissemination the Recommendation Statement, which contained untrue statements of material fact.
23 Prior to the dissemination of the materially false and misleading Recommendation Statement,
24 Chinn was aware of the above-referenced facts and financial information regarding Finjan's
25 expected future financial performance and the true value of the Company, which indicate that the
26 Multiyear Projections were unreasonably low and that the Merger was financially unfair to the
27 Company's shareholders.

28

AMENDED CLASS ACTION COMPLAINT

105.    As a director of Finjan, Chinn had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced material false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Chinn negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

106.    As a direct and proximate result of Chinn's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

107.    As a direct and proximate result of the false and misleading Recommendation Statement Chinn authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## **COUNT III**

**Against Defendant Eric Benhamou for Violations of Section 14(e) of the Exchange Act**

108.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

109.    Benhamou was a director of the Company from June 2013 through the consummation of the Merger, and has served as a director of the Company's subsidiary, Finjan, Inc., since 2006.  He also served on the Transaction Committee and as the Chairman of the Audit Committee. Mr. Benhamou is also Chairman and CEO of Benhamou Global Ventures, LLC, which he founded in 2003 to make activist investments tech firms.

110.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

111.    Benhamou violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Benhamou was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

112.    As a director of Finjan, Benhamou had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced material false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Benhamou negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

113.    As a direct and proximate result of Benhamou's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

AMENDED CLASS ACTION COMPLAINT

114.    As a direct and proximate result of the false and misleading Recommendation Statement Benhamou authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## COUNT IV

**Against Defendant Glenn Daniel for Violations of Section 14(e) of the Exchange Act**

115.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

116.    Daniel was a director of the Company from April 2014 through the consummation of the Merger. He also served as the Chair of the Compensation Committee and a member of the Audit Committee.

117.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

118.    Daniel violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Daniel was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

119.    As a director of Finjan, Daniel had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation

Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced materially false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Daniel negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

120.    As a direct and proximate result of Daniel's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

121.    As a direct and proximate result of the false and misleading Recommendation Statement Daniel authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## COUNT V

**Against Defendant John Greene for Violations of Section 14(e) of the Exchange Act**

122.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

123.    Greene was a director of the Company from June 2018 through the consummation of the Merger. He is also a Partner, Managing Principal, and Portfolio Manager of Halcyon Capital Management LP (now named Bardin Hill Investment Partners LP) and shares primary portfolio management responsibilities for the firm. Halcyon/Bardin Hill was one of the Company's largest shareholders owning approximately 14.2% of the Company's outstanding common stock. Mr. Greene previously served as a board observer (prior to being appointed as a director) for Bardin Hill during their funds' ownership of the Company's Series A Preferred Stock and Series A-1 Preferred Stock.

AMENDED CLASS ACTION COMPLAINT

124.   Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

125.   Greene violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Greene was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

126.   As a director of Finjan, Greene had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced materially false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Greene negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

127.   As a direct and proximate result of Greene's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

128.    As a direct and proximate result of the false and misleading Recommendation Statement Greene authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## <u>COUNT VI</u>

**Against Defendant Harry Kellogg for Violations of Section 14(e) of the Exchange Act**

129.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

130.    Kellogg was a director of the Company from April 2014 through the consummation of the Merger. He also served a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

131.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

132.    Kellogg violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Kellogg was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

133.    As a director of Finjan, Kellogg had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the

Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced material false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Kellogg negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

134.    As a direct and proximate result of Kellogg's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

135.    As a direct and proximate result of the false and misleading Recommendation Statement Kellogg authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## COUNT VII

**Against Defendant Gary Moore for Violations of Section 14(e) of the Exchange Act**

136.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

137.    Moore was a director of the Company from November 2015 through the consummation of the Merger.

138.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any

solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."
15 U.S.C. § 78n(e).

139.    Moore violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Moore was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

140.    As a director of Finjan, Moore had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced material false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Moore negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

141.    As a direct and proximate result of Moore's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

142.    As a direct and proximate result of the false and misleading Recommendation Statement Moore authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

AMENDED CLASS ACTION COMPLAINT

## COUNT VIII

**Against Defendant Alex Rogers for Violations of Section 14(e) of the Exchange Act**

143.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

144.    Rogers was a director of the Company from June 2013 through the consummation of the Merger, and served as a director of the Company's subsidiary, Finjan, Inc., since 2006. He also served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Rogers also serves as a managing director of HarbourVest Partners LLC. HarbourVest was one of the Company's largest shareholders owning approximately 15.5% of the Company's outstanding common stock.

145.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

146.    Rogers violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Rogers was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

147.    As a director of Finjan, Rogers had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced materially false and misleading statements regarding the Company's

AMENDED CLASS ACTION COMPLAINT

projections, the value of the Company, and the purported fairness of the Merger. Rogers negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

148.    As a direct and proximate result of Rogers' negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

149.    As a direct and proximate result of the false and misleading Recommendation Statement Rogers authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## <u>COUNT IX</u>

**Against Defendant Michael Southworth for Violations of Section 14(e) of the Exchange Act**

150.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

151.    Southworth was a director of the Company from April 2014 through the consummation of the Merger.  He also served as a member of the Transaction Committee and the Audit Committee.

152.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

AMENDED CLASS ACTION COMPLAINT

153.    Southworth violated this clause of Section 14(e) because he negligently authorized the dissemination the Recommendation Statement, which contained untrue statements of material fact. Prior to the dissemination of the materially false and misleading Recommendation Statement, Southworth was aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Multiyear Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

154.    As a director of Finjan, Southworth had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain any untrue statements of material fact. He breached this duty by allowing the Recommendation Statement to be disseminated to solicit shareholder support of the Tender Offer with the above-referenced materially false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. Southworth negligently allowed a recommendation statement containing materially false and misleading statements to be disseminated to shareholders in connection with a tender offer, in violation of Section 14(e).

155.    As a direct and proximate result of Southworth's negligent preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement was an essential link in consummating the Merger, which deprived shareholders of full and fair value for their Finjan shares.

156.    As a direct and proximate result of the false and misleading Recommendation Statement Southworth authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares) in an amount to be determined at trial.

## COUNT X

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

157.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

158.    The Individual Defendants acted as controlling persons of Finjan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors or CEO of Finjan, they had the power to influence and control and did influence and control the decision making of the Company, including the content and dissemination of the various statements in the Recommendation Statement that are false and misleading.

159.    Each of the Individual Defendants was provided with and had unlimited access to copies of the Recommendation Statement alleged by Lead Plaintiff to be misleading, both prior to and after it was issued, and had the ability to prevent the issuance of the false and misleading statements or cause them to be corrected.

160.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Merger and the signature of the CEO certifying that the information set forth in the Recommendation Statement was true, complete and correct. The Individual Defendants were thus directly involved in the making of the Recommendation Statement.

161.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

162.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the Exchange Act, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

AMENDED CLASS ACTION COMPLAINT

**RELIEF REQUESTED**

WHEREFORE, Lead Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B.      Awarding Lead Plaintiff and the members of the Class compensatory and/or rescissory damages against Defendants, including pre-judgment and post-judgment interest;

C.      Awarding Lead Plaintiff and the members of the Class reasonable attorneys' fees, expert fees, and other costs; and

D.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: November 9, 2020                    Respectfully submitted,

**OF COUNSEL**                              */s/ David E. Bower*
                                            David E. Bower

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde                          David E. Bower (SBN 119546)
Miles D. Schreiner                          **MONTEVERDE & ASSOCIATES PC**
The Empire State Building                   600 Corporate Pointe, Suite 1170
350 Fifth Avenue, Suite 4405                Culver City, CA 90230
New York, New York 10118                    Tel: (213) 446-6652
Tel: 212-971-1341                           Fax: (212) 202-7880
Fax: 212-202-7880                           dbower@monteverdelaw.com
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com                *Counsel for Lead Plaintiff and Lead Counsel*
                                            *for the Putative Class*
*Counsel for Lead Plaintiff and Lead Counsel*
*for the Putative Class*

AMENDED CLASS ACTION COMPLAINT