1

2

3

4                  UNITED STATES DISTRICT COURT

5                NORTHERN DISTRICT OF CALIFORNIA

6

7    IN RE FINJAN HOLDINGS, INC.            Case No.  20-cv-04289-EMC
     SECURITIES LITIGATION.
8
                                            **ORDER GRANTING DEFENDANTS'**
9                                           **MOTION TO DISMISS**

10                                          Docket No. 24

11

12

13

14          Lead Plaintiff Robert Grier has filed a securities action against Finjan Holdings, Inc.

15   ("Finjan"), its President and CEO Philip Hartstein, and former members of Finjan's Board of

16   Directors (eight individuals[1]).  Lead Plaintiff asserts that Defendants violated §§ 14(e) and 20(a)

17   of the Securities Exchange Act of 1934 based on misrepresentations related to a tender offer in

18   which Fortress Investment Group LLC, through an affiliate, acquired all of Finjan's stock for

19   $1.55 per share.  The misrepresentations, which effectively undervalued Finjan's shares, were

20   contained in the Recommendation Statement (Schedule 14D-9) and/or amendments thereto that

21   Defendants disseminated to Finjan shareholders.  *See generally* Defs.' RJN, Ex. A (Rec. St. at 12)

22   (stating that, the Board unanimously "determined that the Offer, the Merger and the other

23   transactions contemplated by the Merger Agreement are fair to and in the best interests of the

24   Company and its stockholders" and "recommended that the stockholders of the Company tender

25   their Shares in the Offer").  Currently pending before the Court is Defendants' motion to dismiss.

26

27

28   _____
     [1] Those individuals are: Daniel Chinn, Eric Benhamou, Glenn Daniel, John Greene, Harry
     Kellogg, Gary Moore, Alex Rogers, and Michael Southworth.

Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** the motion to dismiss but gives Lead Plaintiff leave to amend.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   Finjan

As alleged in the operative complaint, Finjan is a cybersecurity business.  It has three wholly-owned subsidiaries (sometimes referred to as "lines of business" by Lead Plaintiff):

- Finjan Mobile, Inc. ("FMI");

- Finjan, Inc. ("FI"); and

- Finjan Blue, Inc. ("FBI").

FMI operates a mobile security business.  FI and FBI focus on investing in cybersecurity technologies and intellectual property, intellectual property licensing, and intellectual property enforcement.  *See* FAC ¶ 27.  According to Lead Plaintiff, Finjan derives most of its revenue from intellectual property licensing and intellectual property enforcement.  *See* FAC ¶ 28.[2]

B.   General Timeline re Merger

Based on the Recommendation Statement,[3] it appears that the Finjan Board first considered strategic options, including but not limited to a sale of the company, back in the spring of 2018.

---

[2] Lead Plaintiff alleges that, as part of its intellectual property, Finjan has a portfolio of patents that "relate[s] to software and hardware technologies that detect malicious code and thereby protect end users from identity and data theft, spyware, malware, phishing, trojans, and other web and network threats."  FAC ¶ 28; *see also* FAC ¶ 30 (alleging that, as of May 2020, "Finjan had more than 50 organically-developed patents issued worldwide," as well as "90+ complementary patents [acquired from, *e.g.*,] IBM").

[3] The Court may consider the Recommendation Statement even at the 12(b)(6) phase because of the incorporation-by-reference doctrine.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (noting that (1) "incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself"; that (2) "[t]he doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims"; and that (3) "a defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim'").

That being said, the Court bears in mind that "what inferences a court may draw from an incorporated document should . . . be approached with caution. . . . [U]nlike judicial notice, a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6),'" but "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well pleaded complaint."  *Id.* at 1003.

United States District Court
Northern District of California

1   *See* Rec. St. at 13.  "[T]he Board authorized the formation of a transaction committee . . . ,

2   consisting of independent directors Eric Benhamou and Michael Southworth," which, "in

3   coordination with the Company's Chairman, Daniel Chinn, was delegated the power to oversee a

4   sales process and make certain day-to-day decisions [although] not empowered to ultimately reject

5   or approve any transaction."  Rec. St. at 13.  The Board also hired a financial advisor, Atlas.  *See*

6   Rec. St. at 14.  There is no allegation that Atlas was biased or was acting in self-interest in doing

7   its work for the Board.

8          Atlas began an outreach to potential transaction partners.  It contacted more than 50

9   companies, of which 11 eventually entered into confidentiality agreements with Finjan.  *See* Rec.

10  St. at 14.  Among these companies were Fortress and a company identified in the

11  Recommendation Statement as "Party B."  *See* Rec. St. at 14-20.  Finjan had discussions with the

12  companies, including Fortress and Party B, but nothing came to fruition by December 2019 (*i.e.*,

13  after almost 2 years of effort).  Thereafter, in February 2020, the Finjan Board decided to close the

14  process and to focus instead on moving forward as an independent company.  *See* Rec. St. at 21.

15         By April 2020, however, the Board appeared to change course and discussions began anew

16  with both Party B and Fortress.  On April 1, 2020, Party B expressed an interest in acquiring

17  Finjan for $1.50 per share.  *See* Rec. St. at 21.  By late April, however, Party B indicated that "it

18  was not willing to pursue a transaction at $1.50 per share and proposed restructuring the

19  transaction as an asset purchase.  Party B also indicated that it would need to perform further due

20  diligence on the Company."  Rec. St. at 22.

21         Subsequently, on May 5, 2020, Fortress proposed to acquire Finjan for $1.50 per share.

22  Three days later, Fortress raised the proposal to $1.55 per share.  *See* Rec. St. at 23.  The Merger

23  Agreement between Finjan and Fortress – which provided for a merger consideration of $1.55 per

24  share – was ultimately entered into and announced on or about June 10, 2020.  The $1.55 merger

25  consideration represented a premium of approximately 15.8% to the company's closing share

26  price on June 8, 2020, and a premium of approximately 20.2% to the company's closing share

27  price on June 1, 2020 (*i.e.*, one week earlier).  *See* Rec. St. at 25.

28         On June 24, 2020, the Board issued the Recommendation Statement, *i.e.*, recommending

United States District Court
Northern District of California

1   that shareholders tender their shares.  The Recommendation Statement was subsequently amended

2   and supplemented on July 8, 16, and 23, 2020.

3        The merger was ultimately completed on or about July 24, 2020.

4   C.   Recommendation Statement

5        The Recommendation Statement issued by the Finjan Board was supported by a Fairness

6   Opinion.  Atlas, as the financial advisor, was hired to prepare the Fairness Opinion.  *See* Rec. St.

7   at 30.  For the Fairness Opinion, Atlas did (1) a Premiums Paid Analysis, (2) a Selected Public

8   Company Trading Multiples Analysis, and (3) a Discounted Cash Flow Analysis.

9        • Under the Premiums Paid Analysis, Atlas found that the value of Finjan stock was

10           about $1.56 to $1.64 per share.  *See* Rec. St. at 31.

11       • Under the Selected Public Company Trading Multiples Analysis, Atlas found that

12           the value of Finjan stock was about $1.62 to $1.63 per share.  *See* Rec. St. at 34.

13       • Under the Discounted Cash Flow Analysis, Atlas found that the value of Finjan

14           stock was about $1.42 to $1.55.  *See* Rec. St. at 33.

15       As indicated above, under the terms of the tender offer, Finjan shareholders would get

16   $1.55 per share.  According to Lead Plaintiff, only the Discounted Cash Flow Analysis supported

17   the fairness of the merger consideration ($1.55), and the Discounted Cash Flow Analysis was

18   flawed because it was based on "Multiyear Projections" which in turn were based on false or

19   misleading information supplied by Finjan management.  *See* FAC ¶¶ 64-65 (alleging that

20   management provided Atlas with certain information "to derive projections for revenue, operating

21   expenses, and unlevered free cash flow through 2024 (referred to herein as the Multiyear

22   Projections)"); *see also* Rec. St. at 32 (noting that, "[i]n calculating the standalone equity values

23   implied by the discounted cash flow analysis, Atlas used Company Projections for the unlevered

24   cash flows for the remainder of the year ending December 31, 2020[;] [i]n addition, Atlas used the

25   following assumptions, based on and derived from information provided by management, and that

26   management confirmed were reasonable as of the date of Atlas' opinion, to forecast the unlevered

27   free cash flows for calendar years 2021 through 2024").  Lead Plaintiff maintains that the

28   Multiyear Projections – which estimated revenues of approximately $160 million for the period

2021 to 2024[4] – undervalued Finjan.  Lead Plaintiff's FAC (attached chart) identifies four false or misleading statements in the Recommendation Statement: (1) the Multiyear Projections themselves; (2) the Discounted Cash Flow Analysis as it was based on the Multiyear Projections; (3) statements that the Multiyear Projections were reasonable; and (4) statements that the tender offer was fair.

D.     Alleged Falsity

        The Multiyear Projections, based on information that Finjan management gave to Atlas in or about May 2020, indicated that Finjan was expected to earn about $160 million in revenue across all three business lines (*i.e.*, FMI, FI, and FBI) over five years (*i.e.*, 2020-2024).  According to Lead Plaintiff, this was false or misleading because, only six months earlier, in December 2019, Finjan issued an Investor Presentation in which it stated that it expected to generate $200-400 million in licensing and enforcement revenue alone (*i.e.*, for fewer than all three business lines) for the 2019-2022 period.  The December 2019 Investor Presentation was filed with the SEC as part of Finjan's 8-K.  Lead Plaintiff calculates that, with $200 million in revenue, Finjan's stock would have been worth about $4.36 per share; with $400 million in revenue, Finjan's stock would have been worth about $15.50 per share.  *See* FAC ¶ 89.

        Lead Plaintiff maintains that, during this six-month period, nothing of significance happened that would warrant this drop in valuation of revenue.  Lead Plaintiff does not dispute that the COVID-19 pandemic took root during this time but asserts that it did not have a significant impact on Finjan.  In fact, Finjan management and third-party analysts expressed optimism about Finjan during this same time.  For example:

        •     On March 4, 2020, Finjan had an earnings call in which Mr. Hartstein (Finjan's President and CEO) commented on the prospects of the subsidiary FBI.  FBI is a patent acquisition and development venture with IBM.  In 2017 and 2018, FBI acquired the rights to over 90 IBM patents in the security sector.  *See* FAC ¶ 36.

_____

[4] *See* Rec. St. at 32 (indicating that, as part of the Multiyear Projections, management estimated "$140 million in cumulative litigation-related revenue spread equally across the years 2021 to 2024" and "$20 million in cumulative licensing and other revenue over the four year period").

1          Mr. Hartstein noted in the earnings call that the FBI patents had previously been

2      "'purely incremental in value to what would normally be achievable under the [FI]

3      license" but now the FBI patents were "actually driving their own programs, their

4      own licenses where the focus is first on [those] patents," *i.e.*, "instead of [the FI]

5      patents lea[ding] the discussion.'"  FAC ¶ 36.  He added: "'[B]ased on what I've

6      seen in the licensing pipeline, I have above an average to possibly even high

7      expectations that that portfolio will certainly yield more profit than it did

8      expense.'"  FAC ¶ 36.

9     •   In the same March 2020 earnings call, Finjan's CFO (Jevan Anderson) commented

10      on the prospects of the subsidiary FMI: "'With over 2 million download [of our

11      mobile browser of VPN offering InvinciBull], we continue to innovate and grow

12      our patent portfolio, protect our investment, and inventions in [FMI].  In fact, we

13      issued another related patent just last week.'"  FAC ¶ 37.  The 10-Q at that time for

14      Finjan also indicated growth for FMI, noting, *inter alia*, as follows: "'There is still

15      a limited appreciation for how much personal data is being pushed out over the

16      internet for anyone to capture[,] and unlike desktops and laptop computers, mobile

17      devices do not have the same kind of access to security. . . . [W]e are using and

18      building upon our current patented technology and migrating it into the mobile

19      platform so consumers can have greater control of their security and personal

20      information.'"  FAC ¶ 37.

21     •   On May 13, 2020, Finjan had another earnings call.  During that call, Mr. Hartstein

22      (Finjan's President and CEO) stated: "'Our prospective licensing program

23      continues and if anything more aggressively as we continue to pursue unlicensed

24      use of Finjan's patented technologies and enforce pricing protection provisions in

25      our existing contracts with licensees.'"  FAC ¶ 54.

26     •   In the same May 2020 earnings call, Mr. Harstein acknowledged that COVID-19

27      had delayed two trials (against ESET and Cisco) but noted that a number of other

28      cases "'remained largely unimpacted, notably Juniper, Rapid 7, SonicWall, Qualys,

United States District Court
Northern District of California

1   Palo Alto Networks and Fortinet. . . . We [also] prevailed at the PTAB in three IPR

2   challenges with ESET, Juniper Networks and Unified Patents.'"[5]  FAC ¶ 55.

3   • And in the same May 2020 earnings call, Mr. Anderson (Finjan's CFO) stated:

4   "'We feel confident that our litigation and licensing programs will yield additional

5   cash generating events for the company.'"  FAC ¶ 57.

6   • On May 18, 2020, Investor Observer (a financial investment website) noted in an

7   article that "'the average rating from Wall Street analysts, FNJN stock has a mean

8   target price of $5.  This means analysts expect the stock to rise 252.11% over the

9   next twelve months.'"  FAC ¶ 92.

10  • Sometime in May 2020, "a sophisticated Finjan investor, Dmitriy Konzan, had an

11  article published on *Seeking Alpha* finding the $1.50 share price [for Finjan stock]

12  to severely undervalue Finjan.  Citing to public statements made by the Company

13  and their management, Mr. Kozin found the shares to be worth between 4.8x-10x

14  the Merger Consideration [of $1.55 per share]."  FAC ¶ 86.  (As noted above, the

15  merger was not actually announced until June 10, 2020.)

16  • In another article (the date is not specified), "an investor who closely followed

17  Finjan" stated that " COVID-19 or not, Finjan should do well'" and that the

18  company was "'realistically worth 3x more than [the] current share price and

19  potentially 10x more.'"  FAC ¶ 42.

20      Lead Plaintiff also suggests that, optimism aside, the then-current state of Finjan justified

21  more than $1.55 per share.  At or about the time of the merger, Finjan "carried no debt [and] had a

22  cash balance of over $32 million, current assets over $36 million, and total assets over $48

23  million.  On a per share basis, that represents values of $1.16 per share in cash [alone], $1.30 per

24  share in current assets, and $1.66 per share in total assets."  FAC ¶ 31.  The merger consideration

25  _____

26  [5] Lead Plaintiff also notes that, in spite of COVID-19, Finjan management did not change its
    revenue projections (for the remainder of the fiscal year 2020) between April and May 2020.  *See*
    FAC ¶ 41; *see also* Rec. St. at 37-38 (discussing the April and May projections).  *But see* Mot. at 9
27  & n.4 (asserting that, "[a]lthough management made no changes to its revenue projections, it did
    make changes to its projected operating expenses, which resulted in an increase in the Company's
28  projected operating loss for the remainder of the fiscal year") (emphasis omitted).

of $1.55 per share was "only $0.39 per share above the Company's cash value [of $1.16] and

[was] a discount to the Company's total asset value net of debt [*i.e.*, $1.66 per share]."  FAC ¶ 58;

*see also* FAC ¶ 85 (alleging that "the Merger Consideration represented a discount to the

Company's then-current asset and total asset value net of debt – which means that *foregoing all*

*future revenue*, the Merger Consideration was less than the then-current value of the Company's

existing assets") (emphasis added).

E.      Asserted Downward Trend and/or Uncertainty

        In turn, Defendants argue that the Recommendation Statement and Fairness Opinion

contained therein were accurate because there was volatility and/or a downward trend during the

relevant period.  For example:

- *Stock price.*  There was a downward trend in stock price, particularly in the first
  quarter of 2020.

  o   On August 2, 2018, the stock closed trading at $3.94 per share.  *See* Rec. St.
      at 14.

  o   On October 8, 2018, the stock closed trading at $5.08 per share.  See Rec.
      St. at 26.

  o   On November 6, 2018, the stock closed trading at $3.83 per share.  *See* Rec.
      St. at 15.

  o   On November 9, 2018, the stock closed trading at $3.87 per share.  *See* Rec.
      St. at 16.

  o   On December 7, 2018, the stock closed trading at $2.78 per share.  *See* Rec.
      St. at 16.

  o   On March 8, 2020, the stock closed trading at $0.78 per share.  *See* Rec. St.
      at 21.

  o   On May 8, 2020, the stock closed trading at $1.24 per share.  *See* Rec. St. at
      23.

  o   On June 9, 2020, the stock closed trading at $1.33 per share.  *See* Rec. St. at
      24.  (Per the Recommendation Statement, the $1.55 merger consideration

United States District Court
Northern District of California

represented a premium of approximately 15.8% to the company's closing share price on June 8, 2020, and approximately 20.2% to the company's closing share price on June 1, 2020 (*i.e.*, one week earlier).  *See* Rec. St. at 25.)

- *Revenues.*  There was both volatility and a downward trend in revenues.
  - There is "inherent unpredictability of the Company's licensing and litigation settlements, which frequently leads to fiscal quarters with no revenue."  Rec. St. at 26.
  - Finjan "reported no revenue for the fourth quarter of 2018."  Rec. St. at 17.
  - Finjan also "reported no revenue for the first quarter of 2019."  Rec. St. at 17.
  - In addition, Finjan "reported no revenue for the fourth quarter of 2019."  Rec. St. at 21.
  - Altogether, for the fiscal year 2019, Finjan "had total operating expenses of $33.7 million compared to revenues of $13.2 million" – *i.e.*, a loss of over $20 million.  Rec. St. at 26; *see also* Rec. St. at 36 (noting that Finjan "had recorded no revenues in five of the last eight quarters").  (*But see* FAC ¶ 32 (alleging that, for the quarter ending March 2020, Finjan generated $3.8 million in revenues).)

- *Operating expenses.*  Operating expenses were high.
  - As indicated above, for the fiscal year 2019, Finjan "had total operating expenses of $33.7 million compared to revenues of $13.2 million."  Rec. St. at 26.
  - For fiscal year 2020, Finjan management made financial projections in April and May 2020.  "Although management made no changes to its revenue projections, it did make changes to its projected operating expenses, which resulted in an increase in the Company's projected operating loss for the remainder of the fiscal year."  Mot. at 9; *see also* Rec.

St. at 37-38 (providing details on operating expense and operating loss).

- *Cash balances.*  The company's "cash balances had decreased from $65 million (June 30, 2018) to $27 million (projected for June 30, 2020)."  Rec. St. at 36.

- *COVID-19.*  The COVID-19 pandemic led to uncertainty, a delay in revenue, and an increase in expenses.
  - Because of the pandemic, there were "court closures" and "uncertainty regarding court reopenings."  Rec. St. at 26.
  - "On March 16, 2020, [a federal court] declared a mistrial in the Company's case against ESET due to the COVID-19 pandemic."  Rec. St. at 21.  (Two days later, the stock closed trading at $0.78 per share.  *See* Rec. St. at 21.)  *But see* Opp'n at 3-4 (noting that, even if revenue were delayed, that should not mean "a complete loss of revenue from a forecast that went through 2024").

- *Unfavorable rulings.*  In mid-January 2020, Finjan "received an unfavorable order from the court in its case against Checkpoint," which led to Party B "pausing further pursuit of the Company given the adverse decision."  Rec. St. at 21.

Defendants also suggest that, volatility and downward trends aside, the $1.55 merger consideration was not off the mark as, on April 1, 2020, Party B expressed an interest in acquiring Finjan at $1.50 per share.  *See* Rec. St. at 21.  Moreover, Party B ultimately withdrew that offer; by late April, it told Finjan that " was not willing to pursue a transaction at $1.50 per share and proposed restructuring the transaction as an asset purchase."  Rec. St. at 22.

Finally, Defendants note that Lead Plaintiff has failed to allege any improper motive on their part in recommending the tender offer to Finjan shareholders.

## II.    DISCUSSION

A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

United States District Court
Northern District of California

Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

Although the parties do not dispute the Rule 8 and 12 parameters above, they do have a disagreement as to whether (1) Rule 9(b) and (2) a provision in the Private Securities Litigation Reform Act ("PSLRA") are applicable in the instant case.

    1.   Rule 9(b)

The main claim brought by Lead Plaintiff is a violation of § 14(e) of the Securities Exchange Act.  Section 14(e) provides in relevant part that "[i]t shall be unlawful for any person [1] to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading *or* [2] to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer[.]"  15 U.S.C. § 78n(e) (emphasis added).[6]  In *Varjabedian v.*

---

[6] Lead Plaintiff also has a § 20(a) claim, which is a derivative claim.  *See* 15 U.S.C. § 78(t)(a) (providing that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title [15 U.S.C. § 78a *et seq.*] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action").

United States District Court
Northern District of California

1    *Emulex Corp.*, 888 F.3d 399 (9th Cir. 2018), the Ninth Circuit held that, where a plaintiff brings a

2    § 14(e) claim based on the first clause, the plaintiff is not required to make a showing of scienter;

3    rather, such a claim can be based on negligence.  *See id.* at 401, 408.

4           According to Lead Plaintiff, because his claim is ultimately a negligence claim, and not a

5    fraud claim, Rule 9(b) does not apply.  *See* Fed. R. Civ. P. 9(b) (providing that, "[i]n alleging

6    fraud or mistake, a party must state with particularity the circumstances constituting fraud or

7    mistake[;] [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

8    generally").  Defendants argue to the contrary.

9           The Court concludes that Rule 9(b) is applicable in the instant case.  Even though a § 14(e)

10   claim *can* be predicated on negligence, a § 14(e) claim that *is* predicated on fraud should still be

11   subject to Rule 9(b) – *i.e.*, precisely because it is grounded in fraud.  Notably, the Ninth Circuit

12   has taken this approach for securities claims brought under § 11, which, like § 14(e) claims, do not

13   require scienter.  Whether Rule 9(b) applies to § 11 cases turns on whether the claims are

14   grounded in fraud.  In *In re Glenfed Securities Litigation*, 11 F.3d 843 (9th Cir. 1993), a pre-

15   PSLRA case, the court noted that (1) "[u]nder § 11 of the 1933 Act, a person who acquires a

16   security issued pursuant to a false and misleading registration statement may sue for damages" and

17   that (2) a § 11 claim does not require scienter (*i.e.*, "liability may be imposed for innocent or

18   negligent material misstatements or omissions").  *Id.* at 849-50.  However, when a § 11 claim is

19   "grounded in allegations of fraud, . . . the allegations must meet the requirements of Rule 9(b)."

20   *Id.* at 850; *see also In re Daou Sys.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (noting that scienter is

21   not required for a § 11 claim but adding that, even though "section 11 does not contain an element

22   of fraud, a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his

23   complaint 'sounds in fraud'" – *e.g.*, if a plaintiff alleges "'a unified course of fraudulent conduct

24   and rel[ies] entirely on that course of conduct as the basis of a claim, [then] the claim is said to be

25   "grounded in fraud" or to "sound in fraud"'").

26          The question, then, for the instant case is whether Lead Plaintiff's § 14(e) claim is

27   grounded in fraud, even though he does not necessarily have to show fraud in order to have a

28   viable claim.  The allegations in the FAC are not suggestive of negligence or even gross

1    negligence.  Rather, the FAC alleges that Defendants *knew* the Multiyear Projections were false.

2    *See, e.g.*, FAC ¶ 67 ("The Individual Defendants directed and approved Atlas's use of the

3    Multiyear Projections for its DCF [Discounted Cash Flow] Analysis.  However, as set forth herein,

4    Defendants *did not genuinely believe* in the Multiyear Projections, and *knew* that the numbers

5    reflected therein where far below their genuine expectations regarding the Company's future

6    financial performance.") (emphasis added); FAC ¶ 77 ("Defendants *did not actually believe* in the

7    Multiyear Projections, and *knew* they were false and misleading . . . . Defendants knew that the

8    only valuation analysis that Atlas performed for which the Merger Consideration fell within a

9    range of fairness was the DCF Analysis, which Defendants *knew* was predicated on the

10   unreasonably low Multiyear Projections.") (emphasis added).  Accordingly, the Court holds that

11   Rule 9(b) is applicable to Lead Plaintiff's § 14(e) claim.

12           2.    <u>PSLRA</u>

13           The PSLRA includes the following provision regarding a plaintiff's pleading with respect

14   to the defendant's state of mind:

15                   Except as provided in subparagraph (B), in any private action arising
16                   under this title [15 U.S.C. §§ 78a *et seq.*] in which the plaintiff may
                     recover money damages only on proof that the defendant acted with
17                   a particular state of mind, the complaint shall, with respect to each
                     act or omission alleged to violate this title, state with particularity
18                   facts giving rise to a strong inference that the defendant acted with
                     the required state of mind.

19   15 U.S.C. § 78u-4(b)(2)(A).

20           Lead Plaintiff contends that the "strong inference" requirement should not apply in the

21   instant case because a negligence claim turns on the defendant's conduct and not her state of mind.

22   *See* Opp'n at 21.  In support, Lead Plaintiff relies on *Varjabedian v. Emulex Corp*., No. SACV 15-

23   00554-CJC(JCGx), 2020 U.S. Dist. LEXIS 40037 (C.D. Cal. Feb. 25, 2020), a district court

24   opinion that issued after the Ninth Circuit held that § 14(e) claims can be based on negligence and

25   remanded to the lower court.  There, the district court noted as follows:

26                   Negligence is not a state of mind, but a standard of care defined by a
                     defendant's conduct.  *See Fargo v. City of San Juan Bautista*, 857
27                   F.2d 638, 642 (9th Cir. 1988) [a § 1983 case].  As the Ninth Circuit
                     has explained, negligence "refer[s] to and categorize the actor's
28                   conduct rather than his or her state of mind," and state of mind is

United States District Court
Northern District of California

"not at issue" in a claim for negligence. *Id.* As discussed below, negligence in a securities action depends on whether defendants exercised reasonable prudence in their actions and inactions – their state of mind is ultimately irrelevant. *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). Accordingly, under the Ninth Circuit's interpretation of the first clause of Section 14(e), liability does not depend on "proof that the defendant acted with a particular state of mind." *See* 15 U.S.C. § 78u-4(b)(2)(A); *see also Blau v. Harrison*, 2006 U.S. Dist. LEXIS 19795 (N.D. Ill. Mar. 24, 2006) (finding § 78u-4(b)(2)(A) inapplicable to "claims . . . based on averments of negligence"). The Court therefore concludes that the PSLRA's "strong inference" requirement does not apply here. *See* 15 U.S.C. § 78u-4(b)(2)(A).

Defendants cite several district court decisions, and one unpublished Ninth Circuit decision, that appear to reach the opposite conclusion. These decisions required Section 14(a) plaintiffs to "plead with particularity facts that give rise to a strong inference of negligence." *See Knollenberg v. Harmonic*, 152 F. App'x 674, 683 (9th Cir. 2005); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000); *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1016 (D. Ariz. 2017). But none address the issue identified by Plaintiff: whether negligence – the failure to exercise due care – should be treated as a "particular state of mind." *See* 15 U.S.C. § 78u-4(b)(2)(A). Nor have Defendants explained why the Court should disregard the Ninth Circuit's clear pronouncement that negligence is not a state of mind. *See Fargo*, 857 F.2d at 642. The Court therefore considers whether Plaintiff properly alleges negligence under the normal pleading standards of the Federal Rules of Civil Procedure.

*Id.* at *28-29.

The Seventh Circuit case *Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009), also supports Lead Plaintiff's position, although *Beck* addressed a § 14(a) claim instead of a § 14(e) claim. In *Beck*, the court noted that § 14(a), which addresses a proxy solicitation that contains a misleading misrepresentation or omission, "impl[ies] at worst negligence by the issuer," and "negligence is not a state of mind [but rather] a failure, whether conscious or even unavoidable . . . , to come up to the specified standard of care"; accordingly, it is "incorrect" to require a § 14(a) complaint to comply with the strong inference requirement. *Id.* at 682. *See also Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) (rejecting argument that, in a § 14(a) case, the plaintiff was required to "plead a strong inference of negligence"; "[t]he better reasoned cases have followed . . . *Beck*").

In response, Defendants contend that the *Varjabedian* court decided the matter incorrectly, ignoring the Ninth Circuit's *Varjabedian* decision that led to the remand to the district court and

United States District Court
Northern District of California

issuance of the *Varjabedian* decision discussed *supra*.  According to Defendants, in *Varjabedian*, the Ninth Circuit implicitly endorsed the "strong inference" requirement for § 14(e) claims.  *See* Reply at 12.  Defendants point to the following language from the Ninth Circuit's decision:

> **B.  Omission of a material fact**
>
> The district court did not reach the question whether omitting the Premium Analysis – a one-page chart containing seventeen transactions involving semiconductor companies – from the Recommendation Statement constitutes omission of a material fact in the context of the entire transaction, and we will not reach the question.  Although it is difficult to show that this omitted information was indeed material, we remand for the district court to consider the question in the first instance.  *See Zucco Partners*, 552 F.3d at 991 ("[T]he plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." (internal quotation marks omitted)).

*Varjabedian*, 888 F.3d at 408.

As indicated by the above, the *Varjabedian* court invoked *Zucco Partners*.  And the part of *Zucco Partners* that the court invoked relates to the "strong inference" requirement (albeit in discussing deliberate recklessness and not negligence).  The following provides the broader context from *Zucco Partners*:

> To adequately plead scienter, the complaint must now "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).
>
> The Supreme Court recently defined "strong inference" in *Tellabs*, concluding that a securities fraud complaint will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged."  127 S. Ct. at 2510  (emphasis added). . . .
>
> To adequately demonstrate that the "defendant acted with the required state of mind," a complaint must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Daou*, 411 F.3d at 1014-15 (citing *Silicon Graphics*, 183 F.3d at 974).  In *Silicon Graphics*, we defined the "deliberate recklessness" standard, noting that "we continue[] to view it as a form of intentional or knowing misconduct."  183 F.3d at 976.  More specifically, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so

United States District Court
Northern District of California

1
2
3
4
5
6

> may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness." *Id.* at 974. Rather, the plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 976 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)) (quotation marks omitted).

7    *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

8    The Ninth Circuit's opinion in *Varjabedian* suggests but does not clearly adopt the "strong

9   inference" requirement in § 14(e) cases. However, some district courts have applied the strong

10   inference requirement. For example, in *Brown v. Papa Murphy's Holdings Inc.*, No. 3:19-cv-

11   05514-BHS-JRC, 2020 U.S. Dist. LEXIS 102021 (W.D. Wash. May 20, 2020) (report and

12   recommendation, subsequently adopted on June 10, 2020), the court noted:

13
14
15
16
17
18
19
20
21
22
23
24
25

> Plaintiff further argues that he is not required to plead with particularity that Papa Murphy defendants acted with negligence under the PSLRA because negligence is not a "state of mind." Dkt. 29, at 33. The PSLRA explicitly requires a plaintiff to plead a strong inference of the requisite state of mind with particularity. *See* 15 U.S.C. § 78u-4(b)(2)(A). Unlike plaintiff's position, the Ninth Circuit's *Varjabedian* decision did not conclude that a plaintiff is not required to plead a strong inference of negligence. In support of his argument that negligence is not a "state of mind," plaintiff cites to the Ninth Circuit's opinion in *Fargo v. City of San Juan Bautista*, which states that "state of mind is not at issue where . . . negligence . . . [is] alleged." 857 F.2d 639, 643 (9th Cir. 1988). However, Fargo contemplated whether negligence was a state of mind under a 42 U.S.C. § 1983 action, not whether negligence was a state of mind under the PSLRA or a Section 14(e) action. These statutes and the case law interpreting them use a different definition of a person's "state of mind" and must be followed here. Further, more recent opinions by the U.S. Supreme Court and the Ninth Circuit have recognized negligence as a "state of mind." *See Farmer v. Brennan*, 511 U.S. 825, 836 (recognizing that negligence can be a culpable state of mind); *Salviejo-Fernandez v. Gonzales*, 455 F.3d 1063, 1067 (9th Cir. 2006) (stating that negligence is a culpable state of mind). Thus, the Court finds that plaintiff must plead facts giving rise to a strong inference that Papa Murphy defendants acted with negligence. *See* 15 U.S.C. § 78u-4(b)(2)(A).

26   *Id.* at *18-19; *see also In re Ocera Therapeutics Secs. Litig.*, No. 17-cv-06687-RS, 2018 U.S. Dist.

27   LEXIS 219270, at *11, 37-38 (N.D. Cal. Oct. 16, 2018) (acknowledging *Beck* but still holding that

28   a plaintiff must plead with particularity facts giving rise to a strong inference of negligence).

16

1
2
3
4
5
6
7
8
9
10
11
12

United States District Court
Northern District of California

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court, however, need not conclusively rule on the issue of whether, in a § 14(e) case, the PSLRA requires a plaintiff to allege facts giving rise to a strong inference of negligence (or, for that matter, what exactly that would mean).  As discussed below, Lead Plaintiff does not dispute that, in the case at bar, he must allege facts supportive of not only objective falsity but also *subjective* falsity, which is essentially a state-of-mind requirement.  Thus, Lead Plaintiff must ultimately plead facts giving rise to a strong inference of subjective falsity.  *See, e.g.*, *In re Hot Topic Sec. Litig.*, No. CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 180513, at *14-15, 18 (C.D. Cal. May 2, 2014) (where alleged misrepresentations involved defendants' opinions, noting that plaintiff must show both objective and subjective falsity; regarding subjective falsity, stating that, "[u]nder the PSLRA, Plaintiff must plead 'facts giving rise to a strong inference' that the Defendants made these misstatements with the proper state of mind – here knowledge"); *City of Hialeah Emples. Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1174-75, 1177 (D. Or. 2018) (noting that plaintiff must show objective and subjective falsity in a case involving an allegedly false opinion; regarding subjective falsity, stating that, "[u]nder the PSLRA, Plaintiff must 'state with particularity facts giving rise to a strong inference'" of "Defendants' actual disbelief that the Lower Projections more accurately reflected FEI's future performance as a standalone company").

B.    Falsity

As noted above, Lead Plaintiff's main cause of action is a § 14(e) claim.  Section 14(e) provides in relevant part that "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  15 U.S.C. § 78n(e).  As is clear from this language, an essential element to a § 14(e) claim is falsity.

In the instant case, Lead Plaintiff's primary assertion is that the Multiyear Projections (which were based on information supplied by Finjan management to Atlas, the financial advisor, to prepare its Fairness Opinion) were false.  Specifically, Lead Plaintiff notes that, under the Multiyear Projections, Finjan was estimated to have revenues of about $160 million for the 2020-2024 period for all three lines of business.  In contrast, only six months earlier (in December 2019), Finjan management projected that the company would have revenues of $200-400 million

for the 2019-2022 period – and for licensing and enforcement revenue alone. *See generally* FAC (attached chart) (identifying four false or misleading statements in the Recommendation Statement: (1) the Multiyear Projections themselves; (2) the Discounted Cash Flow Analysis as it was based on the Multiyear Projections; (3) statements that the Multiyear Projections were reasonable; and (4) statements that the tender offer was fair).

Both parties agree that the Multiyear Projections are opinions. Under Ninth Circuit law, where opinions are at issue, falsity has two elements: (1) objectively, the opinion is not true and (2) subjectively, the speaker of the opinion did not hold the belief. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (stating, with respect to "pleading falsity of opinion statements," that, "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue"); *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (stating that, "[b]ecause these fairness determinations are alleged to be misleading opinions, not statements of fact, they can give rise to a claim . . . only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading").

1.  Objective Falsity

In their papers, Defendants primarily argued that Lead Plaintiff failed to allege objective falsity because the mere difference in projections, by itself, is not sufficient. *See* Mot. at 14 ("The allegations that the [Multiyear Projections] were different than those made by management six months earlier is insufficient without particular allegations as to why one set of projections was correct and the other misleading."). Defendants emphasized that the difference in projections could just be a difference of opinion. *See* Mot. at 15 ("Plaintiff's Complaint is missing the 'something more' that could make its claims more than just a 'mere disagreement' about the fairness of the tender offer.").

Defendants, however, have oversimplified Lead Plaintiff's position. Lead Plaintiff has done more than just present higher projections in December 2019 and then lower projections in or about May 2020. Lead Plaintiff has, for example, made allegations that, after the December 2019

18

projections, Finjan management continued to express optimism about the company's prospects (across all three lines of business), most notably, in the May 13, 2020, earnings call, which was just one month before the merger agreement was signed and several months after the COVID-19 pandemic was underway in the United States.  Furthermore, at or about that same time, third-party analysts were also expressing optimism about the company – and not just in generalized terms. *See, e.g.*, FAC ¶ 92 (alleging that, on May 18, 2020, Investor Observer (a financial investment website) noted in an article that "'the average rating from Wall Street analysts, FNJN stock has a mean target price of $5" which "means analysts expect the stock to rise 252.11% over the next twelve months"); FAC ¶ 86 (indicating that, sometime in May 2020, "a sophisticated Finjan investor, Dmitriy Konzan, had an article published on *Seeking Alpha* finding the $1.50 share price [for Finjan stock] to severely undervalue Finjan[;] [c]iting to public statements made by the Company and their management, Mr. Kozin found the shares to be worth between 4.8x-10x the Merger Consideration [of $1.55 per share]"); FAC ¶ 42 (in an article (date not specified), "an investor who closely followed Finjan" stated that "COVID-19 or not, Finjan should do well'" and that the company was "'realistically worth 3x more than [the] current share price and potentially 10x more").[7]

On the other hand, there are also facts that favor Defendants' position that the Multiyear Projections were not objectively false or, more broadly speaking, that the tender offer was fair. For example, in the months preceding the tender offer, the stock had not always performed well and/or revenues were low.[8]  The merger consideration of $1.55 per share was more than the then-current stock price.  Party B had made an offer ($1.50 per share) that was similar in value to the merger consideration, and there were no other suitors.  Under the Premiums Paid Analysis (also

---

[7] Defendants have argued that management's optimism was about the long term.  *See* Reply at 4 (arguing that "[t]he Finjan statements clearly involve long-term and capital-intensive development efforts").  However, as indicated above, at least some third-party analysts were looking at the relatively near future.

[8] According to Lead Plaintiff, poor performance by stock and/or low revenues were implicitly already taken into account when Finjan management projected, in December 2019, that the licensing and enforcement revenue alone was expected to be $200-400 million for the period 2019-2022.

1    part of the Fairness Opinion), Atlas found that the value of Finjan stock could be as low as $1.56

2    per share.  *See* Rec. St. at 31.  In addition, there was uncertainty in the future, both because of

3    COVID-19 and the nature of Finjan's business (patent licensing and enforcement which involves

4    extended negotiations and at times litigation).

5         The Court, however, need not resolve whether Lead Plaintiff has made plausible

6    allegations of objective falsity because, as discussed below, he has failed to plausibly allege

7    subjective falsity.

8              2.    Subjective Falsity

9         As noted above, subjective falsity means that the speaker did not hold the belief professed.

10   In the instant case, this means that Lead Plaintiff must plead facts giving rise to a strong inference

11   that Defendants did not believe the Multiyear Projections were true – *i.e.*, that Defendants *knew*

12   that the Multiyear Projections were false even though they were presenting them to Atlas as true

13   for purposes of developing the Fairness Opinion.  *See also* FAC ¶ 67 ("The Individual Defendants

14   directed and approved Atlas's use of the Multiyear Projections for its DCF [Discounted Cash

15   Flow] Analysis.  However, as set forth herein, Defendants *did not genuinely believe* in the

16   Multiyear Projections, and *knew* that the numbers reflected therein where far below their genuine

17   expectations regarding the Company's future financial performance.") (emphasis added); FAC ¶

18   77 ("Defendants *did not actually believe* in the Multiyear Projections, and *knew* they were false

19   and misleading . . . . Defendants knew that the only valuation analysis that Atlas performed for

20   which the Merger Consideration fell within a range of fairness was the DCF Analysis, which

21   Defendants *knew* was predicated on the unreasonably low Multiyear Projections.") (emphasis

22   added).

23        In a recent opinion, the Ninth Circuit underscored that, if a "complaint fails to plead a

24   plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in

25   establishing scienter."  *Prodanova v. H.C. Wainwright & Co., LLC*, No. 19-56048, 2021 U.S.

26   App. LEXIS 10124, at *2 (9th Cir. Feb. 2, 2021) (also noting that a "a securities fraud lawsuit

27   requires a showing of an intent to defraud investors," and not just "[m]ere negligence").  While the

28   court acknowledged that "a complaint lacking a plausible motive allegation may still meet its

United States District Court
Northern District of California

20

burden of pleading a strong inference of scienter," it also stated that "the lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter.  Only where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook the failure to allege a plausible motive."  *Id.* at *14-15. *Prodanova*, of course, was a 10b-5 case, and not a § 14(e) case; nevertheless, the principles articulated therein have equal applicability here because Lead Plaintiff must plead subjective falsity, and not just negligence, given the specific nature of his § 14(e) claim which is based on opinion.

Notably, Lead Plaintiff's FAC contains no allegations as to why Defendants would endorse the Multiyear Projections as true if they actually believed them to be false.  The FAC does not contain any allegations suggesting that Defendants would secure unique benefits not afforded to shareholders if the tender offer were to go through.  Nor are there any other allegations suggesting that Defendants' interests regarding the tender offer were not aligned with those of the shareholders.  In fact, two Defendants were independent directors (notably, the two who made up the Transaction Committee), and thus would appear to have no vested interest one way or the other with respect to the tender offer.  This lack of *any* motive is highly problematic in light of *Prodanova*.

Moreover, the failure to allege a plausible motive cannot be overlooked here because there are not compelling and particularized facts alleged in support of the claim of fraudulent intent.  As noted above, the independent board members on the Transaction Committee supported the tender offer.  Furthermore, there was concrete market evidence that the merger consideration of $1.55 per share was reasonable – *i.e.*, at or about the same time of Fortress's offer, Party B had made an offer of $1.50 per share.  So did Fortress.  There were no other interested parties despite Atlas's marketing efforts.  This evidence of what the actual market was willing to offer is direct evidence of market value unlike the circumstantial and interpretive approach of, *e.g.*, Atlas's Premiums Paid Analysis and Selected Public Company Trading Multiples Analysis (which, unlike the Discounted Cash Flow Analysis, were not derived from the Multiyear Projections).  *See also* Rec. St. at 31 (noting that, under the Premiums Paid Analysis, "Atlas reviewed the premiums (and discounts)

United States District Court
Northern District of California

paid in acquisitions of other publicly traded technology companies in the United States, since January 1, 2017, with transaction values between $15 million and $100 million"); Rec. St. at 33 (noting that, under the Selected Public Company Trading Multiples Analysis, "Atlas selected [four] publicly traded companies engaged in business which Atlas judged to be analogous to the Company, based on its business model (intellectual property-focused with periodic revenue events) and small-cap size").

The Court acknowledges that, at the hearing, Lead Plaintiff offered for the first time a reason why management would have wanted the tender offer: specifically, if the merger to happen, then Finjan would no longer be a public company but rather a private one, and employment of management is more secure in a private company as opposed to a public one. This motive, however, has not been alleged in the operative pleading and therefore the Court gives it no consideration at this juncture. Lead Plaintiff, however, is given leave to amend his § 14(e) claim so as to include allegations giving rise to a strong inference of subjective falsity. The Court does not opine whether this allegation alone would be sufficient to state a claim.[9]

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants Defendants' motion to dismiss. Lead Plaintiff has four (4) weeks from the date of this order to file an amended complaint. Defendants shall file a response to the amended complaint within seven (7) weeks from the date of this order.

This order disposes of Docket No. 24.

**IT IS SO ORDERED**.

Dated: April 13, 2021

_____
EDWARD M. CHEN
United States District Judge

---

[9] Because the Court holds that Lead Plaintiff has failed to allege subjective falsity, it does not address Defendants' remaining arguments such as a failure to plead loss causation.