David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Putative Class*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE FINJAN HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 3:20-cv-04289-EMC |
|  | CLASS ACTION |
|  | **SECOND AMENDED COMPLAINT** |
|  | Judge:    Hon. Edward M. Chen |
|  | Courtroom 5 – 17th Floor |

Lead Plaintiff Robert Grier ("Lead Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### SUMMARY OF THE ACTION

1.      Lead Plaintiff brings this class action against Finjan Holdings, Inc. ("Finjan" or the "Company") and its President and Chief Executive Officer Philip Hartstein ("Hartstein", and collectively with Finjan, the "Defendants") for their violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(e) and 78t(a). Lead Plaintiff's claims arise in connection with the tender offer by Fortress Investment Group LLC, through its affiliates (collectively "Fortress"), to acquire all the issued and outstanding shares of Finjan (the "Tender Offer").

2.      The Tender Offer was made pursuant to an agreement and plan of merger dated June 10, 2020 ("Merger Agreement"), pursuant to which, following the completion of the Tender Offer, an affiliate of Fortress merged with and into Finjan with Finjan surviving as a wholly owned subsidiary of Fortress (the "Merger"), and Finjan shareholders were cashed-out for a grossly inadequate $1.55 per share of Finjan stock they owned (the "Merger Consideration").

3.      On June 24, 2020, to convince Finjan shareholders to tender their shares, Defendants caused a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statement to be disseminated to Finjan's shareholders, which was subsequently amended and supplemented on July 8, 16, and 23, 2020 (as amended and supplemented, the "Recommendation Statement" or "RS"). The Recommendation Statement and its Amendments were signed by Hartstein in his capacity as the President and Chief Executive Officer of Finjan. As set forth below, the Recommendation Statement was materially false and misleading with respect to Finjan's financial projections and prospects, the value of shareholders' shares, and the fairness of the Merger Consideration.

4.      The Recommendation Statement provided a materially false and misleading valuation picture of Finjan by disseminating unreasonably low financial projections for 2020-2024 (the "Fairness Opinion Projections"). The Fairness Opinion Projections were based on information supplied by Hartstein and his management team, and were used to frame the Merger Consideration as fair. In reality, the Merger Consideration drastically undercompensated Finjan shareholders and did not provide them with anything close to the intrinsic fair value of their shares.

5.      The numbers reflected in the Fairness Opinion Projections are contradicted by and inconsistent with statements made by the Company, Hartstein and other members of Finjan management leading up to the Merger, and reflect just a fraction of the actual value of the Company. Specifically, in December 2019, the Company stated it projected revenues of $200-$400 million for 2019-2022 for just its licensing and enforcement business line, yet the Fairness Opinion Projections (spanning 2020-2024) only reflect $166 million in total revenue.

6.     The Fairness Opinion Projections were created solely for use by Finjan's financial advisor, Atlas Technology Group LLC ("Atlas"), in conjunction with its fairness opinion Discounted Cash Flow ("DCF") Analysis. Without the Fairness Opinion Projections, Atlas would have been unable to issue a fairness opinion, and Defendants would have been unable to claim that the Merger Consideration provided shareholders with fair value for their holdings. Indeed, the other financial analyses performed by Atlas found that the Merger Consideration was unfair—as do similar analyses from published shareholders and financial analysts. Therefore, the only way Atlas was able to issue a fairness opinion and collect its $2.162 million fee was to utilize the unreasonable Fairness Opinion Projections, which Defendants authorized Atlas to use despite knowing that the Fairness Opinion Projections did not accurately reflect the Company's long-term financial prospects and value.

7.     As set forth below, the Fairness Opinion Projections, the DCF Analysis and present value per share ranges predicated on the Fairness Opinion Projections, and the statements conveying that the Fairness Opinion Projections were reasonable, misled Finjan shareholders about the fair value of their shares and caused them to tender their shares and accept the unfair Merger Consideration.

8.     The Tender Offer expired on July 22, 2020, and Finjan shareholders were cashed out via the Merger for the inadequate Merger Consideration.

9.     For these reasons, and as set forth in detail herein, Defendants violated Sections 14(e) and 20(a) of the Exchange Act. Accordingly, Lead Plaintiff seeks to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Lead Plaintiff alleges violations of Sections 14(e) and 20(a) of the Exchange Act.

11.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

1  present in this District for jurisdictional purposes or has sufficient minimum contacts with this

2  District as to render the exercise of jurisdiction over the Defendants by this Court permissible

3  under traditional notions of fair play and substantial justice. "Where a federal statute such as

4  Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes

5  whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r*

6  *Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has

7  minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

8  the defendant in any federal district court." *Id*. at 1316.

9      12.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

10  78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had

11  an effect in this District; (ii) Finjan maintains its principal place of business in this District and

12  each of the Defendants either resides in this District or has extensive contacts within this District;

13  (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this

14  District; (iv) most of the relevant documents pertaining to Lead Plaintiff's claims are stored

15  (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have

16  received substantial earnings and compensation in this District by doing business here and

17  engaging in numerous activities that had an effect in this District.

18                                    **PARTIES**

19      13.    Lead Plaintiff was, at all relevant times, a shareholder of Finjan.

20      14.    Defendant Finjan is a Delaware corporation that maintains its principal executive

21  office at 2000 University Avenue, Suite 600, East Palo Alto, California 94303. Prior to the Merger,

22  Finjan's common stock traded on the Nasdaq under the ticker symbol "FNJN". Finjan survived

23  the Merger as a non-publicly-traded, wholly owned subsidiary of Fortress.

24      15.    Defendant Philip Hartstein is, and has been at all relevant times, the President and

25  Chief Executive Officer ("CEO") of Finjan. He became President in June 2013, and President and

26  CEO in July 2014. He served as President of the Company's subsidiary, Finjan, Inc., since April

27  2013.  In his role as President and CEO, Hartstein was charged with the direction and management

28

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

of the Company's assets and future investments. He served as a Board Member to the Company's subsidiary, Finjan Mobile, Inc., since June 2015. In addition, Hartstein oversaw the Company's strategic LP investment in Jerusalem Venture Partners Cyber Strategic Partners venture fund since the Company's August 2013 investment until December 31, 2019 when the Company completed the sale of the investment. Prior to joining Finjan, Hartstein was a vice president and portfolio manager with IP Navigation Group, a full-service patent monetization firm, from 2012 to 2013. He served as Managing Director with Rembrandt IP, a firm that specializes in investing in and monetizing infringed intellectual property, from 2009 to 2012. Before that, Hartstein was a director with IPotential in the patent brokerage group, and a director and early member of Ocean Tomo's management team overseeing both the patent analytics and IP acquisitions groups. Hartstein also previously worked as an in-house IP manager for a medical device start-up, and as a patent engineer for a boutique IP law firm. Hartstein is recognized for his expertise in IP monetization efforts for both private and public companies, often ranked as one of the *IAM* 300 "World's Leading IP Strategists", and was twice named as one of the Top 40 "Global Players" driving the world's rapidly changing IP market.

## FURTHER SUBSTANTIVE ALLEGATIONS

### I.    Overview of Finjan and the Strategic Review Process

16.    In June 2013, Finjan became a publicly traded company capitalized with $30 million, installed a new management team including Hartstein as President, and began a focused program to license the Company's landmark intellectual property. In May 2014, Finjan was listed on the NASDAQ Capital Market under the trading symbol "FNJN".

17.    Finjan operates a cybersecurity business focused on intellectual property licensing and enforcement, mobile security application development, and investing in cybersecurity technologies and intellectual property. The Company's operations are broken into three business lines: intellectual property licensing and enforcement, mobile security application development, and investing in cybersecurity technologies and intellectual property. Licensing and enforcement of the Company's cybersecurity patent portfolio is operated by its wholly-owned subsidiaries

1 Finjan, Inc. and Finjan Blue, Inc. The Company's mobile security business is operated through its

2 wholly-owned subsidiary Finjan Mobile, Inc.

3     18.    The Company owns a portfolio of patents related to software and hardware

4 technologies that detect malicious code and thereby protect end users from identity and data theft,

5 spyware, malware, phishing, trojans, and other web and network threats. Leading up to the Merger,

6 the Company derived most of its revenue from licensing agreements and the enforcement of

7 patents in patent infringement litigation.

8     19.    On March 7, 2018, Finjan's board of directors ("Board") authorized Hartstein to

9 (i) explore opportunities for a strategic relationship with another patent monetization company,

10 (ii) explore acquiring additional patents, and (iii) engage with an investment bank regarding

11 acquisition opportunities. Hartstein thus wielded significant power and influence over the

12 Company's strategic review process.

13     20.    Hartstein used his power to, *inter alia*, cause the Company to hire Atlas to assist in

14 exploring strategic options in or around August 2018. Atlas already had a preexisting and lucrative

15 relationship with Finjan and Hartstein, as it had provided strategic advisory services to the

16 Company and received $573,548 in aggregate fees for such services between 2018 and 2020. As

17 a corporate law scholar explained: "The relationships between investment banks and corporate

18 management can run deep, and an investment bank often has business with the corporation and its

19 management that span more than one transaction. In these situations, investment banks may be

20 influenced to find a transaction fair to avoid irritating management and other corporate actors who

21 stand to benefit from the transaction. This will ensure future lucrative business." Steven M.

22 Davidoff, *Fairness Opinions*, 55 AM. U. L. REV. 1557, 1587 (2006).

23     21.    As set forth below, Hartstein engaged in communications and meetings with

24 Fortress on various dates throughout the strategic review process, and was thus familiar with

25 Fortress and its plans for Finjan. Based on his conversations with Fortress and his position as

26 Finjan's CEO, Hartstein was also undoubtedly aware of the fact that Fortress is a large-scale "Non-

27

28

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

practicing entity" (NPE) patent aggregator that had been actively acquiring and/or investing or partnering with other companies that operated in the same space for years.[1]

22.     On September 19, 2018, Party B, a strategic acquiror, informed Atlas that it would have potential interest in pursuing an acquisition of Finjan via a stock-for-stock merger.

23.     On October 3, 2018, the Board met via teleconference with management and representatives of Atlas present, and decided to continue discussions with other interested parties rather than Party B. Following the meeting, representatives of Atlas informed Party B that the Board was not interested in a stock-for-stock transaction with Party B.

24.     On October 4, 2018, members of Company management, including Hartstein, held a conference call with representatives of Fortress relating to the Company's business.

25.     On October 31, 2018, representatives of Fortress and Hartstein participated in a telephone conference to discuss due diligence items relevant to a potential bid by Fortress.

26.     On February 6, 2019, Party B submitted a proposal to the Company to acquire all of the Company's stock in exchange for $1.86 per share in cash and a contingent value right that would pay out an undetermined amount based on Company performance over the next five years. On February 14, 2019, Finjan rejected Party B's proposal as inadequate as to both consideration and structure.

27.     On May 15, 2019, Hartstein met in person with representatives of Fortress regarding possible re-engagement in the process by Fortress.

28.     Having been rejected by Finjan at least twice, Party B grew more aggressive. On June 26, 2019, one of Finjan's directors informed the Board of a call he had with one of the Company's stockholders whereby the director learned that Party B had contacted the stockholder regarding coordinating on a transaction.

---

[1]   *See, e.g., Q2 in Review; Second-Quarter NPE Filings Spike as Prior Patent Transfers Spark New Litigation*, RPX Corporation (July 7, 2020) (noting that "[t]he Finjan acquisition is far from Fortress's first foray into patent assertion; indeed, with ample capital on hand and approximately $43.5B under management, the firm has amassed—through various avenues—a stockpile of more than 1,500 US assets of disparate origin and subject matter. Many of its patents are now being asserted by a web of entities under Fortress's control."); *see also* Richard Lloyd, *US patent sales jump, with Samsung, InterDigial and Fortress among those leading the way*, IAM (Jan. 10, 2019).

29.     On July 12 and 17, 2019, Hartstein and Jevan Anderson ("Anderson"), the Company's Chief Financial Officer ("CFO"), met in person with representatives of Fortress regarding the Company's business.

30.     On August 14, 2019, Hartstein and Anderson met in person with representatives of Fortress to discuss the Company's business.

31.     On August 29, 2019, Party B communicated an oral offer to the Company to purchase all shares at $3.00 per share.

32.     On September 16, 2019, the Board along with management and legal and financial advisors met to consider the offers from Party B and Fortress. Once again, they rebuffed Party B, and entered into an exclusivity arrangement with Fortress through October 1, 2019.

33.     On September 20, 2019, Party B sent a letter to the Board criticizing the Company's sale process and expressing concern that the Company entered into exclusive negotiations with Fortress despite Party B's continuing interest in a transaction. Party B also stated that it had previously communicated its willingness to consider making an offer at $3.50 per share if it could conduct three weeks of additional due diligence and indicated that it had not withdrawn its offer of $3.00 per share.

34.     On October 10, 2019, the Board held a telephonic meeting with members of management and legal and financial advisors present. The Board authorized Atlas to reengage with Party B, but only on the condition that Party B would agree to a standstill arrangement to prevent it from acquiring Company shares without approval from the Board. The Board sought to ensure Party B would participate in a negotiated transaction rather than make a hostile offer directly to the Company's shareholders or take other actions to exert influence over the Company.

35.     On November 14, 2019, the Company and Party B entered into an amendment to their confidentiality agreement restricting Party B from acquiring more than 6% of the Company's outstanding shares without Board approval prior to March 30, 2020. This once again indicates that Defendants and the Board were concerned about Party B acquiring more Finjan shares.

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

36.     On November 18, 2019, members of management, including Hartstein, and Party B telephonically discussed due diligence matters.

37.     On December 5, 2019, Party B provided a letter to Atlas offering $2.75 per share and requiring the Company to maintain a minimum cash balance of $48.3 million as of December 31, 2019. Once again, Party B's offer was promptly rejected by Finjan.

38.     On February 3, 2020, Party B sent a letter to the Board indicating that Party B wished to deal directly with the Board (as opposed to Hartstein/management, Atlas, and/or the Transaction Committee) on any further discussion regarding a potential transaction with the Company. Obviously, Party B remained displeased with the way the strategic review process was being conducted.

39.     On February 8, 2020, the Transaction Committee, joined by Finjan Directors Daniel Chinn, Glenn Daniel and John Greene, held a meeting which was also attended by legal advisors to the Company. The discussion involved Party B's February 3, 2020 letter. The Transaction Committee decided to seek more information from management (presumably Hartstein) before responding to the February 3, 2020 letter. This once again indicates that the Board was leaning heavily on management with respect to the strategic review process.

40.     On February 12, 2020, the Transaction Committee, joined by Mr. Chinn, management (presumably Hartstein) and financial and legal advisors, held a meeting. The meeting involved discussions about the prospective negotiation and discussion points with Party B.

41.     On February 18, 2020, Messrs. Chinn and Southworth met in person with representatives of Party B. Party B orally proposed a transaction whereby Company stockholders would receive a distribution of the Company's current cash and a contingent value right representing the right to receive a percentage of the Company's future revenue. *Once again, Party B's proposal was rejected*. Specifically, on February 26, 2020, the Board held a meeting with representatives of management (presumably Hartstein) present. **The Board authorized the Company to publicly announce the close of the strategic review process so that management and the Board could better focus on operating the Company's business**.

9

42.     On March 4, 2020, Finjan publicly announced the close of the strategic process. **Hartstein conveyed confidence in Finjan's path forward as a stand-alone entity**, stating: "While we didn't consummate a transaction, *we are confident in our path forward as an independent entity*."

43.     On April 1, 2020, Party B informed Mr. Chinn of its intent to purchase additional shares of the Company in the market that would trigger a Schedule 13D filing by Party B.

44.     On April 5, 2020, the Board asked Company management to perform a liquidation value analysis.

45.     **On April 12, 2020—just one month after announcing the close of the sales process and mere days after Party B indicated it intended to acquire a sizeable position in Finjan—members of management suddenly reversed course and contacted representatives of Fortress to inquire whether they had an interest in reengaging in acquisition discussions. There is no indication in the Recommendation Statement that the Board authorized such a communication**.

46.     On April 13, 2020, Finjan and Party B entered into a letter agreement providing Party B the exclusive right to negotiate with the Company for just one week (through April 20, 2020), which was only half the amount of time previously offered to Fortress. Defendants and the Board, still concerned about Party B acquiring more shares, made sure to include a standstill provision in the agreement.

47.     On April 24 and 28, 2020, representatives of Fortress and representatives of the Company's management (presumably including Hartstein) spoke telephonically regarding certain business and due diligence matters.

48.     On April 29, 2020, Party B proposed restructuring the transaction as an asset purchase. On May 4, 2020, the Board yet again rejected Party B's proposal. The Recommendation Statement is conspicuously silent as to when—if ever—this decision was conveyed to Party B. Indeed, there is not a single reference to Party B in the Recommendation Statement after May 4, 2020.

49.     Defendants and the Board proceeded to finalize the Merger with Fortress, which was announced on June 10, 2020.

50.     In conjunction with the Merger, Fortress insisted on deal protection provisions including an unreasonably high termination fee of $1,353,709 and an expense reimbursement of up to $1,000,000, both of which the Company would be required to pay to Fortress in the event it sought to terminate the Merger Agreement and pursue a superior proposal. Such provisions are designed to deter competing bidders from coming forward after a merger's announcement.

51.     In the press release announcing the Merger, Hartstein conveyed his excitement about continuing to lead a private Finjan under Fortress's ownership, stating: The acquisition enables Finjan to continue to pursue *our* licensing mission and expand *our* reputation and credibility on policy related initiatives, while providing *us* greater resources and opportunities as a Fortress portfolio company."

52.     Hartstein's comment in the press release announcing the Merger clearly indicated that he would continue his lucrative employment with the post-Merger Company, and a June 10, 2020 article from *IAM* confirmed that Hartstein and his management team would remain in place. Hartstein and Finjan's CFO Jevan Anderson ultimately did maintain their lucrative jobs with Finjan following the consummation of the Merger.

**II.     In March and May 2020, Defendants Conveyed Confidence in Finjan's Stand-Alone Plan and Indicated COVID-19 Was Not Expected to Significantly Impact the Company's Long-Term Prospects, But Abruptly Abandoned Their Stand-Alone Plan Shortly After Party B Threatened to Purchase a Significant Number of Shares**

53.     Hartstein conveyed confidence in Finjan's stand-alone plan on March 4, 2020 (when the close of the strategic process was announced) and in May 2020 (via Finjan's quarterly earnings presentation and earnings call). His confidence in the Company's stand-alone plan was not surprising. Prior to the Merger, Finjan had a successful licensing and enforcement history, financial stability, and strong growth prospects.

54.     As of May 2020, Finjan had more than 50 organically-developed patents issued worldwide, enhanced by the acquisition of 90+ complementary patents from IBM, Trend Micro, and others, for which Finjan has generated over $350 million in licensing fees. The Company had

11

an outstanding track record of patent validity and enforceability and a large pipeline of patent infringement cases.

55.    As of its most recent quarterly report, the Company carried no debt or preferred stock, had a cash balance of over $32 million, current assets over $36 million, and total assets over $45 million. On a per share basis, that represents values of $1.16 per share in cash, $1.30 per share in current assets, and $1.66 per share in total assets.

56.    Furthermore, Finjan generated $13.2 million in revenues for the year ended December 31, 2019, and $3.8 million in revenues during the quarter ended March 31, 2020.

57.    Moreover, Finjan was on the brink of a period of unprecedented growth of its licensing and enforcement revenue. In its December 2019 Investor Presentation, the Company stated that it expected to generate $200-$400 million in licensing and enforcement revenue between 2019 and 2022, which equated to at least $186.8 million to $386.8 million over the next three years (2020-2022) after accounting for the already known 2019 revenues of $13.2 million:



58.    The December 2019 Investor Presentation was filed by Finjan with the SEC on December 9, 2019, and attached to a Form 8-K signed by Hartstein. Accordingly, Defendants knew of the Presentation and its contents. The 8-K stated that the presentation would be used in connection with presentations to investors, analysts and others.

59.    Furthermore, on December 5, 2019, the full Board met with members of management and the Company's financial advisors, and discussed the Company's cash balance.

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

The Company's cash balance was referenced on several slides in the December 2019 Investor Presentation. The Board also met with management and its financial advisors on December 15, 2019. And on February 26, 2020, the Board authorized the Company to publicly announce the close of its strategic review process so that management and the Board could better focus on operating the Company's business plan, which had been detailed in the December 2019 Investor Presentation.

60.     The Company was also entering a period of new growth for Finjan Blue—its patent acquisition and development venture with IBM. In 2017 and 2018 the Company, through Finjan Blue, entered into two Patent Assignment and Support Agreements with IBM, wherein it acquired the rights to over 90 IBM patents in the security sector. Previously, Finjan Blue served as incremental value to many of the Finjan, Inc. licenses; however, during the Company's March 4, 2020 earnings call, the Company announced that it was entering into independent valuation discussions with the Finjan Blue patents of the underlying portfolio:

<u>Sam Rebotsky</u>

Good afternoon, Phil. And this is changed, now that we're on our feet to try to do things. Could you tell me we've paid money for the IBM patents? Has that produced any income so far?

<u>Phil Hartstein</u>

Hi, Sam. Thanks for the question. Yes. So, the way that we -- and I can leave it up to Javen for the technical accounting parts of it. When we talk about the IBM portfolio being incremental in licenses that we've granted and bringing those patents into the Finjan portfolio of companies, for example, I think all the way back to our FireEye license which there was a purchase price allocation, I think at that point at least $2 million of that license went and was allocated specifically for the IBM patent. So, as we go through these license events with new licensees where their Finjan Blue patents are included, yes, there is some allocation for those. As you just heard in the remarks though, we've also now moved from the Finjan Blue patents being purely incremental in value to what would normally be achievable under the Finjan, Inc. license, to now actually driving their own programs, their own licenses where the focus is first on the IBM patents, the Finjan Blue patents instead of Finjan, Inc. patent leaving the discussion. So, this is a new transition for us.

…

<u>Mike Crawford</u>

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

Thanks. What's your confidence that these Finjan Blue license discussions will lead to deals in excess of the $4 million you have remaining to pay to IBM over the next two years?

Phil Hartstein

To be specific, I'd tell you that we would never make an investment we didn't think we could recoup on investment. And we don't file a lawsuit that we don't think we can win a trial. I would say that, we're probably in the neutral investment parameters now with how much we've made on the investment basis relative to that for which we received in licensing, maybe a little bit in plus -- in the plus territory. So, I would tell you, I have -- based on what I've seen in the licensing pipeline, I have above an average to possibly even high expectations that that portfolio will certainly yield more profit than it did expense.

61.     The Company also expressed high expectations for its developing mobile cybersecurity division—Finjan Mobile. As the Company's Chief Financial Officer Jevan Anderson stated on the March 2020 earnings call: "Now, I'd like to turn to Finjan Mobile and our mobile browser of VPN offering InvinciBull. With over 2 million download, we continue to innovate and grow our patent portfolio, protect our investment, and inventions in Finjan Mobile. In fact, we issued another related patent just last week." This rosy outlook for Finjan Mobile was echoed and elaborated on in the Company's most recent 10-Q:

Given our experience of over 20 years in the cybersecurity market we have had the benefit of actively participating in the progression on how technology has moved to meet the new threats and demands. We believe this puts us in a unique position to make observations and determine the best course of action in order to make investments in new developing technologies. There is still a limited appreciation for how much personal data is being pushed out over the internet for anyone to capture and unlike desktops and laptop computers, mobile devices do not have the same kind of access to security. We believe this represents a unique opportunity for Finjan to develop products for consumer mobile devices that were once only available to our enterprise customers. As such, we are using and building upon our current patented technology and migrating it into the mobile platform so consumers can have greater control of their security and personal information.

62.     This optimism—across business lines—was not hampered by the COVID-19 pandemic. In its May 2020 Investor Presentation, Finjan reiterated that while it had closed its strategic review process and no transaction was consummated, it remained "confident in [its] path forward as [an] independent entity."

63.     In the same investor presentation, the Company further stated that its response to the COVID-19 Pandemic was "Business as Usual" with a cut back on non-legal operating expenses and potential savings derived from the CARES Act:

14

## Finjan's Response to COVID-19 Pandemic

**Business as Usual**
- Continue conversations with prospective licensees to arrive at a fair value license
- Working with current litigants as we try to find a path towards settlement

**Monitoring Expenses**
- Addressing overall spend to align with shifting litigation calendar; scaling back operating nonlegal expenses by 25%
- Pursuing potential financial benefit of the CARES Act for Finjan as well as potential SBA and PPP loans

**Employees Remote and Safe**
- Employees effectively working remotely during Shelter-in-Place
- Productive team makes it efficient to manage the business remotely

64.    Furthermore, the May 2020 Investor Presentation indicated that Defendants still expected Finjan's litigation and trial pipeline to commence by early 2024, *i.e.*, **within the time frame of the Fairness Opinion Projections**, as reflected in the following table:

| ESTIMATED LITIGATION TIMELINE DECEMBER 2019 VS. MAY 2020 | | | | |
|---|---|---|---|---|
| **Case** | Event | Dec 2019 | May 2020 | Change |
| **eset** | Trial | 03/09/20 | N/A | Mistrial due to COVID |
| **Bitdefender** | Trial | 04/06/20 | N/A | Successfully Settled on 1/23/20 for $3.8 million |
| **Cisco** | Trial | 06/01/20 | 06/22/2020 | Pushed back 21 days |
| **Trustwave** | Trial | 01/18/21 | Mid-2022 (est.) | Pushed back 1.5 yrs |
| **Rapid1** | Trial | 02/22/21 | 02/22/2021 | No Change |
| **SonicWall** | Trial | 05/03/21 | 05/03/2021 | No Change |
| **CheckPoint** | Trial | 06/07/21 | N/A | Lost decision 1/17/20 Dismissed action 5/27/20 |
| **Juniper** | Appeal | 04/20 (est.) | 2021 | Pushed back 9 months |
| **Qualys** | Trial | 06/22 (est.) | Late 2022 (est.) | Pushed back 6 months |
| **Paloalto** | Trial | 10/22 (est.) | Mid-2023 (est.) | Pushed back 9 months |
| **Fortinet** | Trial | 01/23 (est.) | Early 2024 | Pushed back 1 year |

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

65.     The May 2020 Investor Presentation was filed with the SEC on May 13, 2020, via a Form 8-K signed by Hartstein, which stated that the presentation would be used in connection with presentations to investors, analysts and others. Accordingly, Defendants knew of the presentation and its contents.

66.     COVID-19's lack of impact on Finjan's long-term prospects is further supported by the changes Hartstein and his management team made to the Management Projections[2] from April 2020 to May 2020—they made no changes to its revenue projections.

67.     Furthermore, as Dmitriy Kozin, a sophisticated Finjan investor who closely followed the Company, explained in an article entitled "COVID-19 or not, Finjan should do well," the Company was "realistically worth 3x more than [its then] current share price and potentially 10x more." This was so in light of the Company's licensing pipeline and the fact that there are 9-10 trials expected over the next 3 years with significant potential wins (and thus dramatic cash inflows) resulting from each.

68.     Furthermore, as explained below, based upon the Company's own expected licensing and enforcement revenues of $200-$400 million between 2019-2022, the Company's shares were worth $4.36 utilizing the most conservative $200 million estimate, and $15.50 per share utilizing the $400 million estimate.

69.     Defendants were so confident in Finjan's prospects and ability to execute its stand-alone plan (as set forth in the December 2019 Investor Presentation) that they initially rejected proposals far superior to the Merger Consideration. As noted above, on March 4, 2020, at which point (i) the threat posed by COVID-19 was publicly known and (ii) the Company had just ended discussions with a bidder (Party B) offering $2.75 per share, Finjan issued a press release officially closing the sales process. Director Chinn stated: "As our stockholders are well aware, the Board of Directors has been thoroughly evaluating all of our strategic options for Finjan for over a year.

---

[2]   As defined in the Recommendation Statement, the "Management Projections" were the financial projections for the remainder of fiscal year 2020 that Finjan's management prepared on April 25, 2020 and updated on May 27, 2020 regarding the Company's future operations as a standalone company. RS at 37.

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

After a broad process and careful consideration of the various alternatives, the Board believes remaining an independent entity is currently the best available outcome for Finjan stockholders."

70.     Similarly, during the Company's March 4, 2020 earnings call, Hartstein stated: "As you most likely read in press release today, this process is now formally concluded. While we didn't consummate a transaction, we are confident in our path forward as an independent entity."

71.     When Defendants announced the end of the strategic review process on March 4, 2020 and conveyed confidence in Finjan's prospects as a stand-alone company, they were undoubtedly aware of the risks of COVID-19. Indeed, by February 28, 2020, the Dow Jones Industrial Average, the Nasdaq, and the S&P 500 were each down approximately 13% from their closing prices ten days earlier. Moreover, on January 9, 2020, the World Health Organization ("WHO") announced the virus; on January 20, the U.S. Centers for Disease Control and Prevention ("CDC") announced certain U.S. airports would begin screening for the virus; on January 21, the CDC confirmed the first U.S. case; on January 23, Wuhan, China was placed under quarantine; on January 31, the WHO declared a public health emergency, for just the sixth time in its history; on February 3, the Trump administration declared a public health emergency; on February 10, China's COVID-19 related deaths exceeded those from SARS; and on February 25, the CDC announced COVID-19 was heading toward pandemic status.[3] Simply put, it was clear by late February/early March 2020 that COVID-19 was going to be a major problem with significant negative ramifications across society and business. Yet on March 4, 2020, Hartstein and Finjan conveyed confidence in Finjan's future prospects as a stand-alone entity.

72.     **After Defendants announced the close of the strategic review process, Party B—a publicly traded strategic acquirer (*i.e.*, *one with its own management team already in place*) which had been pursuing Finjan for 1.5 years and was *critical of the way the sales process had been run*—continued  to exert pressure on Defendants and the Board to do a deal**. For example, on April 1, 2020, Party B informed Mr. Chinn of its intent to purchase a sizeable

---

[3]  *A Timeline of COVID-19 Developments in 2020*, AJMC Staff (Jan. 1, 2021), https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020 (last visited May 7, 2021).

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

block of Finjan shares in the market. Hartstein, as an experienced CEO and investor, undoubtedly understood the potential risks he faced if Party B followed through on its threat to acquire a significant ownership stake in Finjan, including (i) further criticism from a company that had already been critical of the way the sales process was run and (ii) pressure tactics aimed at dictating the Company's plans and operations and potential calls for his termination.

73.    On April 12, 2020—just days after Party B's threat to acquire a significant number of shares and a mere month after Defendants had deemed the strategic review process closed—members of Finjan management suddenly contacted representatives of Fortress to inquire whether they had an interest in reengaging in acquisition discussions.

74.    On April 13, 2020, Finjan and Party B entered into a letter agreement providing Party B the exclusive right to negotiate with the Company through April 20, 2020. Finjan and its management and Board, still concerned about Party B acquiring more shares, made sure to include a standstill provision in the agreement.

75.    On April 29, 2020, Party B proposed an asset purchase rather than an acquisition of the Company.

76.    The very next day, April 30, 2020, representatives of Atlas spoke with representatives of Fortress about reengaging in the process.

77.    On May 4, 2020, the Board held a telephonic meeting, which was also attended by representatives of management and financial advisors. The Board once again rejected pursuing a transaction with Party B.

78.    That same day--just two months after determining it was in the best interests of shareholders to pursue the Company's standalone plan—the Board instructed Atlas to continue to explore whether Fortress had an interest in a transaction. Fortress did, because it knew Finjan was trading at a grossly undervalued price and it was eager to quickly acquire the Company on the cheap.

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

79.     Indeed, while Finjan's stock price—like virtually every company's—significantly declined in mid-March 2020, it then rebounded strongly and surged to $1.53 on May 18, 2020, a mere two cents below the Merger Consideration.

80.     Moreover, Hartstein and the Company continued to convey their confidence in the Company's stand-alone plan and strong financial prospects (as set forth in the December 2019 Investor Presentation) during the Company's May 13, 2020 earnings call. With respect to the Company's licensing business, Hartstein and CFO Anderson stated:

**Phil Hartstein:**

Our prospective licensing program continues and if anything more aggressively as we continue to pursue unlicensed use of Finjan's patented technologies and enforce pricing protection provisions in our existing contracts with licensees.

***

Yes. The licensing pipeline is still active. In fact, it's probably where we're spending most of our time today because a lot of the litigations are sort of on fixed time lines and many of those interactions are being handled by outside counsel. So our attention is focused on licensing really in two buckets.

First would be, I think, the obvious, which is the category of companies who may be just coming online using Finjan's patented technologies or maybe even more protracted licensing discussions, but there's a number of those that are ongoing. And so our historical practice is that we don't really announce the progress of those until those deals actually get struck. But those are sort of those episodic income events that you see sort of spike on our revenues once reported.

…

**Jevan Anderson:**

Yes. Let me take the first part there. I mean, we are constantly monitoring our cash position, Sam. We're very sensitive to what our cash balance is. At $32 million, *we have more than enough cash to survive through certainly the next four quarters and well beyond. So we're not concerned.*

81.     On the same call, and with respect to the Company's litigation activity, Hartstein indicated that he believed while COVID-19 had delayed the trials against ESET and Cisco until later in 2020, nothing had changed regarding the Company's long-term litigation outlook:

Additional timing issues have presented themselves, but scheduling of our preexisting docketed matters is beginning to normalize. I must say that I am pleased with the court's swift action during the shutdown to make certain adjustments to the courtroom settings and procedures in an effort to continue operating.

As everyone now knows, in the first half of this year, we were approaching two significant trials. ESET was up in March, followed by Cisco in June. Just as we were being introduced to the COVID pandemic, our first trial with ESET concluded in a mistrial after a full week of testimony. Just yesterday, we had a scheduling conference with the court to discuss a new trial date and new parameters for courthouse and courtroom interaction. Unfortunately, the trial rescheduling was pushed again to a new case management conference set for July 23 as the Southern District Court has extended its closure until mid-to-late June.

In our Cisco case, we were originally scheduled to start our trial on June 1 but after conferring with the court we learned that they aren't planning to reopen until that date. To provide some scheduling buffer, the start date of that trial has been pushed back a few weeks and we'll now begin on June 22. Both trials are significant near-term events for Finjan and we are working diligently to keep both cases on track while continuing to pursue the earliest feasible trial dates.

Since our last call in early March, during the early days of the pandemic, much of the outstanding case updates have remained largely unimpacted, notably Juniper, Rapid 7, SonicWall, Qualys, Palo Alto Networks and Fortinet. Regarding Trustwave, we filed a patent infringement complaint in Delaware Federal Court, escalating the already filed breach of contract dispute over unpaid royalties, which has also shifted from state court and merged into our federal case.

In addition to the Cisco and ESET trials currently set for 2020, we still anticipate Rapid 7 and SonicWall to occur in the first half of 2021. And three more, Qualys, Palo Alto Networks and Fortinet in 2022. Importantly, our patents remain as strong as ever. We prevailed at the PTAB in three IPR challenges with ESET, Juniper Networks and Unified Patents.

82.     In other words, on the May 13, 2020 earnings call, Hartstein indicated that he and the Company did not expect COVID-19 related litigation delays to meaningfully impact the Company's long-term outlook.

83.     During the May 13, 2020 earnings call, Finjan's CFO Anderson reiterated Hartstein's confidence in the Company's litigation and licensing related opportunities and indicated the Company had more cash than it knew what to do with, stating:

Part of our cash management, we diligently pursue tax efficiencies accordingly, importantly we are taking advantage of the many corporate tax divisions in the COVID CARES Act recently signed into law. This will bring an additional $3.2 million of cash onto our balance sheet later this year, due to a refund on taxes paid on our profits in 2018, where the details can be found in Note 10 of our 10-Q file this morning.

Our focus on cost management has allowed us to maintain a stable balance sheet in the face of investing in upcoming trial schedule. We feel confident that our litigation and licensing programs will yield additional cash generating events for the company. As mentioned on our last call, we will continue to evaluate alternatives on how to best use any *excess cash* from operations to deliver value to our shareholders. This could take form and stock buybacks, special dividends or similar mechanisms. We'll be limited as to what we can do during these uncertain

times in the midst of upcoming trials. But we will work with our Board and Advisors to establish a plan and communicate that to shareholders when appropriate.

84.   Three months after deeming the strategic review process closed, on June 10, 2020, Defendants and the Board agreed to accept the grossly inadequate $1.55 Merger Consideration, which represented only $0.39 per share above the Company's cash value and a discount to the Company's total asset value *net* of debt. Moreover, the derisory $1.55 Merger Consideration represented a 35% **discount** to the Company's high trading price at the beginning of 2020.

85.   In other words, as set forth above, the Merger Consideration was objectively unfair, and Defendants knew this because they were fully aware of the above-referenced financial metrics indicating that the Merger Consideration was objectively unfair, including the implied value of the Company based upon Defendants' own expectation that Finjan would generate $200-$400 million in just licensing and enforcement revenues between 2019-2022.

## III.   The Materially False And Misleading Recommendation Statement

86.   Hartstein reviewed the Recommendation Statement before it was disseminated to the Company's shareholders, and had a duty to ensure it did not contain any materially false or misleading statements. Defendants caused the materially false and misleading Recommendation Statement to be filed with the SEC and disseminated to Finjan's shareholders. Indeed, the Recommendation Statement and its Amendments could not have been disseminated without Hartstein's approval, as Hartstein signed each filing.

87.   As set forth herein, the Recommendation Statement contained materially false and misleading statements which influenced Finjan shareholders' decision concerning whether to tender their shares and whether to seek appraisal, in violation of Sections 14(e) and 20(a) of the Exchange Act.

88.   In conjunction with the Merger, Finjan and the Board obtained a fairness opinion from Atlas. Based on his years of experience as a CEO, director and investor, and his knowledge of mergers & acquisitions,[4] Hartstein knew that the Board would not approve a merger without a

---

[4]   According to his LinkedIn profile, Hartstein's "industry knowledge" includes "mergers & acquisitions", "venture capital", "private equity" and "litigation management." Moreover, it states

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

fairness opinion. Indeed, it is common knowledge to directors and officers of publicly traded companies that fairness opinions are virtually always obtained by boards of directors in conjunction with merger transactions because they can be used as liability-shields to defend against claims for breach of fiduciary duty, and touted to shareholders as evidence that the proposed merger is purportedly fair. *See, e.g.*, Troy A. Paredes, *Corporate Decisionmaking: Too Much Pay, Too Much Deference; Behavioral Corporate Finance, CEOs, and Corporate Governance*, 32 FLA. ST. U.L. REV. 673, 723 (Winter, 2005) (explaining "a fairness opinion from an investment bank" has become "a practical requirement to get the deal done."); Jonathan R. Macey, *The Regulator Effect In Financial Regulation*, 98 CORNELL L. Rev 591, 618-19 (March, 2013) (explaining that "obtaining a fairness opinion has become like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate."); Robert J. Giuffra, Jr., *Investment Bankers' Fairness Opinions in Corporate Control Transactions*, 96 YALE L.J. 119, 120 (November, 1986) (explaining that "[f]airness opinions have been criticized, however, as expensive rubber stamps that insulate directors from liability" and that the primary purpose of fairness opinions and their accompanying valuations "is to persuade shareholders to tender their shares or to approve the terms of a merger. Often, management will include an opinion as to the adequacy of the offered price in tender offer or proxy materials. This representation by an investment bank can have a substantial impact on the shareholders' decision. An improperly prepared fairness opinion can cause shareholders to tender their shares or to approve a merger that they would not otherwise approve."). As has been well documented, fairness opinions are often "deeply flawed", as they "are frequently prepared utilizing methodologies [and inputs] that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions." Steven M. Davidoff, *Fairness Opinions*, 55 AM. U. L. REV. 1557, 1573-78 (2006).

---

that Hartstein received a certification from the Director's College 2015 Executive Education Program from the Rock Center for Corporate Governance at Stanford in June 2015.

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

89.     In connection with Finjan's strategic planning process, Hartstein and his management team prepared financial projections reflecting the Company's anticipated future operations as a standalone entity for the remainder of fiscal year 2020 (the "Management Projections"). However, Atlas needed at least four additional years of projections to perform the most important valuation analysis underlying a fairness opinion, the DCF Analysis.[5] Indeed, five-year forecasts are routinely utilized in conjunction with fairness opinions supporting mergers.[6]

90.     Accordingly, Hartstein and his management team prepared financial information and assumptions, told Atlas the financial information and assumptions were reasonable, and instructed Atlas to utilize such financial information and assumptions to derive projections for revenue, operating expenses, and unlevered free cash flow through 2024 (referred to herein as the Fairness Opinion Projections).

91.     The Defendants directed and approved Atlas's use of the Fairness Opinion Projections for its DCF Analysis. However, as set forth herein, Defendants did not genuinely believe in the Fairness Opinion Projections, and knew that the numbers reflected therein were far below their genuine expectations regarding the Company's future financial performance.

92.     The numbers reflected in the Fairness Opinion Projections were entirely inconsistent with Hartstein's and the Company's prior statements regarding their genuine beliefs about the Company's future prospects.

93.     As set forth in the Recommendation Statement, the Fairness Opinion Projections were predicated on the following inputs and assumptions:

> In calculating the standalone equity values implied by the discounted cash flow analysis, Atlas used Company Projections for the unlevered cash flows for the

---

[5]  *See, e.g.*, Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1575-76 (2006) ("in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus."); Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance*, 75-80 (7th Int'l ed. 2003); Aswath Damodaran, *Investment Valuation*, 11 (2002).

[6]  *See, e.g.*, *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, No. 2017-0910-MTZ, 2019 Del. Ch. LEXIS 47 at *28 (Del. Ch. Jan. 25, 2019) ("Five-year forecasts are routine in fairness opinions supporting mergers."); *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 511 (Del. Ch. 2010) ("In a DCF analysis, future cash flows are projected for each year during a set period, typically five years.").

remainder of the year ending December 31, 2020. In addition, Atlas used the following assumptions, based on and derived from information provided by management, and that management confirmed were reasonable as of the date of Atlas' opinion, to forecast the unlevered free cash flows for calendar years 2021 through 2024:

• the Offer and the Merger close by July 31, 2020;

• $140 million in cumulative litigation-related revenue spread equally across the years 2021 to 2024;

• $20 million in cumulative licensing and other revenue over the four-year period with $6 million per year realized in 2021 and 2022 and $4 million per year realized in 2023 and 2024;

• gross margin of 85.7% in 2021 and gross margins of 90.0% in each subsequent period; and

• operating expenses based on levels forecast in the Company Projections for 2020; litigation expenses from 2021 to 2024 based on historical billings and the expected billings from its law firms assuming cases are finalized over the duration of the forecast period; a reduction from historical levels for expenses related to the Company's mobile portfolio; and all other expenses (finance and operations) held steady from 2021 to 2024 consistent with managing the patent portfolio in a run-off scenario.

RS at 32.

94.     On July 16, 2020, Finjan filed Amendment No. 2 to the Recommendation Statement ("Amendment No. 2"), which disclosed a more complete summary of the Fairness Opinion Projections:

| | 2H 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| Total Revenue | $ 6,000 | $ 41,000 | $ 41,000 | $ 39,000 | $ 39,000 |
| Operating Expenses | $ 13,588 | $ 25,643 | $ 25,643 | $ 23,643 | $ 21,643 |
| Unlevered Free Cash Flow | $ (5,088) | $ 9,138 | $ 8,105 | $ 8,249 | $ 9,689 |

95.     Amendment No. 2 also reiterated that the revenue, operating expense, and unlevered free cash flow projections were derived from information that Finjan management had provided to Atlas and confirmed as reasonable.

96.     The total revenue figures for 2020-2024 amount to only $166 million, and presented a false picture of the true value of Finjan and its prospects. Just a few months earlier, in December 2019, the Company indicated it expected to generate $200-$400 million for licensing and enforcement revenue alone. And, as set forth above, during the time between when the $200-$400 million licensing and enforcement revenue estimate was issued (December 2019) and the creation

24

of the Fairness Opinion Projections (in or around May/June 2020), the Company and Hartstein repeatedly made positive statements about the Company's financial condition, the current and future state of its licensing and enforcement pipeline, and the Company's other growing business lines, Finjan Blue and Finjan Mobile.

97.    Simply put, in December 2019 the Company stated that it expected to generate $200-$400 million over the next three years from its licensing and enforcement revenue alone. And, in the months thereafter, the Company and Hartstein continued to express confidence in the Company's financial prospects, and indicated that COVID-19 had not meaningfully impacted the Company's prospects or valuation picture. Yet, when Atlas needed multi-year projections to render a fairness opinion in June 2020, Defendants authorized the creation of and permitted Atlas to utilize the Fairness Opinion Projections, which reflected only $166 million in total revenues across the entire Company (*i.e.*, all three business lines) between the second half of 2020 and 2024. The glaring difference between the revenue expectations that the Company announced in December 2019 and those reflected in the Fairness Opinion Projections are irreconcilable, and were not justified by any meaningful change to the Company's prospects during the pertinent time period.

98.    The materially false and misleading Fairness Opinion Projections were utilized by Atlas to conduct its DCF Analysis, which resulted in materially false and misleading illustrative present value per share ranges of $1.27 to $1.68 and $1.42 to $1.55, which Defendants authorized to be included on page 33 of the Recommendation Statement. The unreasonably low implied valuation ranges (which were predicated on the unreasonably low Fairness Opinion Projections), further misled Finjan shareholders regarding the fair value of their shares.

99.    Based on the facts set forth above, including (i) the $200-$400 million revenue expectation set forth in the December 2019 Investor Presentation and (ii) the various statements made by Hartstein and Andersen during the March and May 2020 earnings calls (a) conveying continued confidence in the Company's long-term standalone alone plan and (b) minimizing COVID-19's impact on the Company's long-term prospects, Defendants knew that the Fairness Opinion Projections severely and unreasonably discounted the Company's future earning potential

and presented a false and misleadingly low valuation picture of the Company. Indeed, as CEO of the Company, Hartstein was aware of the contents of the December 2019 and May 2020 Investor Presentations and his and his management team's statements and positive views conveyed during the Company's earnings calls.

100.    Atlas's DCF Analysis using the unreasonably low Fairness Opinion Projections was the only valuation analysis Atlas performed that showed the Merger Consideration to fall within a range of "fairness." Accordingly, without the false and misleading Fairness Opinion Projections, Atlas could not have rendered a fairness opinion.

101.    Defendants did not actually believe in the Fairness Opinion Projections, and knew they were false and misleading because they: (i) were predicated upon unreasonable assumptions and were meaningfully below the projections reflected in the December 2019 Investor Presentation, which were prepared in the ordinary course of business and reflected Defendants' actual expected financial outlook for Finjan; (ii) were inconsistent with the Company's, Hartstein's, and Anderson's positive statements made during the months after December 2019 and preceding the announcement of the Merger regarding the Company's positive financial trends, strong growth prospects, and COVID-19's lack of impact on the Company's long-term financial prospects; and (iii) were not used during the negotiation with bidders and were created solely for use in conjunction with Atlas's DCF Analysis. Furthermore, all of the other valuation analyses conducted by Atlas showed that the Company's implied value per share completely exceeded the Merger Consideration,[7] and Defendants knew that the only valuation analysis that Atlas performed for which the Merger Consideration fell within a range of fairness was the DCF Analysis, which Defendants knew was predicated on the unreasonably low Fairness Opinion Projections. Simply put, Defendants knew that all of Atlas's valuations aside from the unreasonable DCF Analysis showed that the Merger Consideration was unfair, and they thus did not genuinely believe that the

---

[7]  Specifically, the Premiums Paid Analysis reflected an implied per share range of $1.56 to $1.64, and the Selected Public Company Trading Multiples Analysis resulted in an implied price per share of $1.62 to $1.63.

Merger and Tender Offer were fair to shareholders. Accordingly, each of the following statements were false and misled Finjan shareholders regarding the Company's prospects and value.

102. For the foregoing reasons, the following statements in the Recommendation Statement were materially false and misleading to Finjan's shareholders:

      i.     The Fairness Opinion Projections themselves (RS at 32, Amendment No. 2), which were false and misleading because Defendants genuinely believed that the Company would generate revenues and cash flows meaningfully in excess of the numbers set forth therein, the projections were predicated on unreasonable assumptions about Finjan's future financial performance and were undercut by facts about the Company's actual and potential levels of operation, and they thus presented a materially defective picture of the Company's value and prospects;

     ii.    The DCF Analysis summary, including the resulting implied present value per share ranges (RS at 32-33), which were materially false and misleading because the analysis and resulting value ranges were based on the unreasonably low Fairness Opinion Projections, which were meaningfully below Defendants' genuine expectations regarding the Company's future, and therefore presented the value of shareholders' shares as being far lower than their genuine fair value; furthermore, the DCF Analysis Summary set forth the false and misleading assumptions underlying the false and misleading Fairness Opinion Projections; and

   iii.    The statements conveying that the Fairness Opinion Projections and their underlying assumptions were "reasonable": (a) RS at 32 - "Atlas used the following assumptions, based on and derived from information provided by management, *and that management confirmed were reasonable* as of the date of Atlas's opinion, to forecast the unlevered free cash flows for calendar years 2021 through 2024; (b) Amendment No. 2 – "Based on the methodology above, revenue and expense estimates were derived by Atlas *from information provided and confirmed by management as reasonable.* Unlevered free cash flow estimates were calculated

by Atlas based on those inputs." These statements were materially false and misleading because, as set forth herein, Defendants did not genuinely believe that the Fairness Opinion Projections and the assumptions upon which they were generated were reasonable, as Defendants knew that the Company's long-term prospects were accurately reflected by the significantly higher projections set forth in the December 2019 Investor Presentation.

103.    These misrepresentations in the Recommendation Statement were material to shareholders because they directly related to the value of Finjan shares and the fairness of the Merger.

104.    As the CEO of the Company and signatory of the Recommendation Statement, Hartstein was responsible for the contents of, and significantly involved in the preparation and dissemination of, the Recommendation Statement. Furthermore, as CEO of the Company, Hartstein was aware of the projections set forth in the December 2019 Investor Presentation, and his and his management team's comments and views regarding the Company's financial condition and prospects that were conveyed during the Company's earnings calls. Therefore, Hartstein knew that the Fairness Opinion Projections significantly slashed the Company's revenue projections as set forth in the December 2019 Investor Presentation, despite the fact that such a significant slash was in no way warranted or justified by his and his management team's outlook or any changes to the Company's long-term business prospects. Hartstein also reviewed Atlas's financial analyses and fairness opinion, knew that the sole purpose for the creation of the unreasonably low Fairness Opinion Projections was for Atlas to generate a fairness opinion, and knew that Atlas's DCF Analysis was predicated on the unreasonably low Fairness Opinion Projections. Nevertheless, Hartstein approved and authorized the dissemination of the Recommendation Statement, which contained the materially false and misleading Fairness Opinion Projections and related false and misleading statements set forth above.

105.    Instead of acknowledging that the Fairness Opinion Projections were inappropriate for use in valuing the Company because they were predicated on unsound and unreasonably low

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

assumptions and inputs, Defendants allowed Atlas to utilize the Fairness Opinion Projections for purposes of its valuations, and allowed the resulting materially false and misleading valuations to get disseminated to shareholders in the Recommendation Statement.

**IV.    Hartstein's Motives for Preparing the Fairness Opinion Projections' Unreasonably Low Inputs and Authorizing the Use and Dissemination of the False and Misleading Fairness Opinion Projections**

106.    Hartstein wielded significant influence over the strategic review process and the Board, which lacked the financial incentive to maximize stockholder value. As Warren Buffet recently noted, based upon his decades of experience, "independent board members are paid hundreds of thousands of dollars for only a few days of work a year" and "aren't vested in the future of the company and too often side with whatever management wants."[8] Such was the case here, as most of Finjan's outside directors were only minimally invested in the Company, and they collectively held just $26,000 in unvested equity-based awards in the aggregate. Moreover, the Board was comprised of individuals who were not dependent on their Finjan directorships as their primary sources of income, as they maintained lucrative jobs and/or other directorships on the professional director circuit (where directors can tout their merger-related experience as an asset).[9]

107.    Moreover, Hartstein was motivated to use the significant power and influence he wielded over the strategic review process, the Board, and Finjan's financial projections (and thus Atlas's valuations and fairness opinion) for his own personal benefit. He had several personal motivations for preparing the unreasonably low inputs that formed the basis of the Fairness

---

[8]   Dawn Lim and Geoffrey Rogow, *BlackRock at Odds With Warren Buffet's Berkshire Hathaway Over Disclosures*, WALL STREET JOURNAL (May 6, 2021).

[9]   For example, Daniel Chinn has been a Partner at Amar Reiter Jeanne Shochatovitch & Co., an Israeli law firm, since 2019. Michael Southworth is the General Manager of the Intelligent Self-Service business at Verint Systems, Inc., and joined the board of Grid Dynamic Holdings Inc. in March 2020. Glenn Daniel was retired after a long and lucrative career as a Managing Director at the global investment bank Houlihan Lokey. Harry Kellogg was retried after a long and lucrative career at Silicon Vally Bank and Wells Fargo Bank, and is actively involved in many industry organizations, serving on many of their boards and advisory boards. Gary Moore is the CEO and Chairman of ServiceSource International, Inc., after a long and lucrative career at Cisco Systems, Inc. and Electronic Data Systems, and sits on the board of KLA-Tencor Corporation, and vArmour Networks, Inc., and is also an Executive in Residence at The Ohio State University Fisher College of Business. Moreover, Alex Rogers and John Greene did not hold Company stock options, Company restricted stock units or shares.

Opinion Projections, and authorizing their use by Atlas and their dissemination in the Recommendation Statement. These personal motivations caused Hartstein's interests and those of Finjan's public shareholders to diverge. Indeed, the Recommendation Statement concedes as much, noting that certain of the Company's executive officers' interests "may create potential conflicts of interest." RS at 5.

*Maintaining His Lucrative Position and Control Over a Privately-Owned Finjan Rather Than Allowing the Alternatives—Which Were Better for Shareholders—to Unfold*

108.     First, several facts indicate that Hartstein's primary concern was in maintaining his leadership position at and control over Finjan, and the take-private Merger with Fortress enabled him to do so while reaping the upside of leading a private rather than public company. While the Board resolved to bring the sales process to a close on February 26, 2020 (which Hartstein and the Company publicly announced on March 4, 2020), *just a few weeks later*—on April 12, 2020— certain "members of management" (which presumably included Hartstein) suddenly contacted representatives of Fortress to inquire whether they had an interest in reengaging in acquisition discussions. It does not appear that the Board authorized management to contact Fortress and inquire about its interest in reengaging, as the Recommendation Statement conspicuously omits any reference to the Board giving such an instruction or request. *See* RS at 22.

109.     Just one week earlier, on April 5, 2020, the Board asked management to perform a liquidation value analysis, the results of which were plagued by Hartstein's conflict of interest. A liquidation obviously would have ended Hartstein's control over Finjan and its assets. Hartstein knew the Board was considering a liquidation based upon the instructions it gave to management at the April 5, 2020 Board meeting.

110.     Hartstein also had a vested interest in and desire to maintain his lucrative position and control over Finjan, which he has led since the Company's first days as a publicly traded corporation. Hartstein joined Finjan as the Company's President in April 2013, before the time the Company became publicly traded as a result of its reverse merger with Converted Organics Inc. Hartstein became CEO of Finjan in 2014, whereafter he was charged with the direction and

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

management of current assets and future investments. Hartstein obviously enjoyed leading Finjan and its business operations, as he renewed his Employment Agreement with Finjan on August 1, 2018 for a term of three years, and he remains the Company's President and CEO today.

111.     Hartstein procured his continued employment prior to the announcement of the Merger. The Merger was announced on June 10, 2020, and an article from *IAM* that same day confirmed that Hartstein and his management team would remain in place. Moreover, while the Recommendation Statement failed to mention that Hartstein would continue with the post-Merger Finjan, it was obvious from the press release announcing the Merger. Therein, Hartstein's comments conveyed his excitement about continuing to lead Finjan under the ownership of Fortress. He stated: "The acquisition enables Finjan to continue to pursue *our* licensing mission and expand *our* reputation and credibility on policy related initiatives, while providing *us* greater resources and opportunities as a Fortress portfolio company." Conspicuously absent from his statement was any mention of how the deal was the best option for Finjan's public shareholders.

112.     Moreover, Fortress's competition—Party B—was a publicly traded strategic acquiror which had (i) been repeatedly rebuffed by Finjan, (ii) made clear to Defendants and the Board that it did not like the way the sales process had been run, and (iii) made clear it intended to agitate for change just days before management suddenly contacted Fortress to reengage with it. *Supra*. And, as noted above, on April 1, 2020 Party B indicated that it was prepared to go hostile by informing Director Chinn of its intent to purchase a significant number of additional Finjan shares in the market, such that it would trigger a Schedule 13D filing. That was the latest shot across the bow by Party B, and Hartstein—as an experienced CEO and investor—undoubtedly understood the ramifications of continuing as the CEO of a publicly-traded Finjan with an aggressive and agitated stockholder hanging over his shoulder. Moreover, as Defendants were aware, Party B had also previously indicated that it was interested in working with other large shareholders to accomplish its goals.

113.     Faced with the choices of: (a) continuing as the CEO of a publicly traded Finjan with Party B—a strategic bidder with its own management team in place, which had expressed its

1    displeasure with how the Company handled the sales process and was threatening to take a sizeable

2    stake in the Company—lurking; (b) continuing as the CEO of a privately-owned Finjan; (c) a

3    liquidation; or (d) an asset purchase transaction with Party B, Hartstein's obvious preference was

4    for a deal with Fortress. Indeed, there was simply no upside for Hartstein to steer the Board towards

5    maintaining Finjan as a stand-alone publicly traded corporation (with Party B agitating and

6    breathing down his neck) when he had the option of continuing in his lucrative position at a

7    privately-owned Finjan. There are obvious benefits to leading a private company, including

8    avoiding the strict formalities, legal requirements, and oversight that come with serving as the

9    CEO of a publicly traded corporation. And Hartstein was familiar with the perks of leading a

10   privately-owned company, as he first joined Finjan when it was private and had previously worked

11   for private companies.

12        114.    Moreover, when management reached back out to reengage with Fortress in April

13   2020, Hartstein knew that there was only one year remaining on his three-year Employment

14   Agreement, and that if Party B pursued its plan to acquire a large block of Finjan shares, it could

15   press for his departure from the Company.

16   *Need for a Fairness Opinion to Get the Merger Approved*

17        115.    As noted above, Hartstein knew that the Merger could not get approval from the

18   Board and shareholders without a fairness opinion. And he knew that Atlas's most important

19   valuation—the DCF Analysis—would be predicated on multi-year financial projections. Thus,

20   because Hartstein preferred the Merger with Fortress over the Company's other alternatives—even

21   though those alternatives would have been better for shareholders—Hartstein was incentivized to

22   ensure that Atlas could render a fairness opinion. Accordingly, Hartstein and his management team

23   supplied Atlas (Hartstein's hand-picked financial advisor) with certain financial information which

24   formed the basis for the unreasonably low Fairness Opinion Projections. Hartstein and his

25   management team told or conveyed to Atlas that such financial information was reasonable, even

26   though Hartstein knew it was unreasonably low.

27   //

28

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

*Change in Control Benefits*

116.    Moreover, Hartstein knew that a merger was a better alternative for his own interests than staying on as the CEO of stand-alone Finjan and running the serious risk of a confrontation with Party B as a shareholder.

117.    Hartstein stood to receive change in control benefits including:

- continued payment of his base salary for 12 months;
- payments over 12 months equal to the average quarterly bonus paid or payable for the prior 12 fiscal quarters dating back to the first quarter of 2017;
- payment of the bonus for the quarter in which the termination occurred;
- extension of the exercisability of non-qualified stock options for up to 12 months;
- reimbursement of COBRA payments for up 12 months; and
- 100% acceleration of vesting with respect to his or her outstanding unvested equity awards.

118.    Hartstein's golden parachute compensation was worth $1,338,233 in total, including $310,000 in restricted stock units.

119.    The existence of these change in control benefits further incentivized Hartstein to prefer a merger over continuing on as the CEO of a stand-alone Finjan with an aggressive Party B as a shareholder.

**V.    The Materially False and Misleading Recommendation Statement Caused Finjan Shareholders Financial Harm**

120.    The Merger, which could not have been accomplished without the materially false and misleading Recommendation Statement, extinguished Finjan shareholders' ownership of Finjan for a price well below fair value.

121.    Numerous sources indicate that the fair value of Finjan stock far exceeded the Merger Consideration.

122.    First, the Merger Consideration represented a discount to the Company's then-current asset and total asset value net of debt—which means that foregoing all future revenue, the

Merger Consideration was less than the then-current value of the Company's existing assets. Moreover, the derisory $1.55 Merger Consideration represented a 35% discount to the Company's $2.36 high trading price at the beginning of 2020.

123.    Second, a month before the announcement of the Merger, a sophisticated Finjan investor, Dmitriy Kozin, had an article published on *Seeking Alpha* finding the $1.50 share price to severely undervalue Finjan. Citing to public statements made by the Company and management, Mr. Kozin found the shares to be worth between 4.8x-10x the Merger Consideration.

124.    Using a "conservative" case, *i.e.*, assuming the low end of the expected revenue range of $200 million from 2020-2022, with SG&A of $25M per year for 3 years, and the cost of revenues at 17%, approximate expenses ($75M+$34M) equal $109 million. The net income over those 3 years becomes $91 million or $3.30 per share. Assuming even distribution and a tax rate of 28%, in line with prior years, earnings per share would be $0.80 per year.

125.    Alternatively, using the "bullish" scenario, *i.e.*, assuming the top end of the expected revenue range of $400 million over 3 years with SG&A of $25M per year for 3 years and the cost of revenues at 17%, approximate expenses ($75M+$51M) equal $126 million. The net income over those 3 years becomes $274 million or $9.96 per share. Assuming even distribution and a tax rate of 28%, in line with prior year, earnings per share would be $2.39 per year.

126.    Even when completely disregarding any potential revenues from Finjan Blue, Finjan Mobile, or any other non-licensing revenues, excluding the potential for revenues greater than the projected $200-400 million range, and assuming no share buybacks, the Company's shares were severely underpriced at $1.50 per share. In the "conservative" scenario, adding the book value of $1.16 to only 4x earnings per share of $0.80 yields a value of **$4.36** per share. In the "bullish" scenario, assuming a mere 6x multiple yields a value of **$15.50** per share:

|  | Revenue | SG&A | Costs | EPS | Book value per share | P/E | Share Value |
|---|---|---|---|---|---|---|---|
| Conservative | $200M | $75M | $34M | $0.80 | $1.16 | 4 | $4.36 |
| Bullish | $400M | $75M | $51M | $2.39 | $1.16 | 6 | $15.50 |

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC

127.    The average of the two scenarios is **$9.93**, or $8.78 if you ignore the current tangible book value (mostly in cash and equivalents). These numbers would obviously be even greater if they were to account for non-licensing revenue or if there are any buybacks, however modest. And as publicly stated by the Company, Finjan's long-term business should be virtually unaffected by any potential recession and minimally impacted by COVID-19.

128.    Third, Atlas found that the value of the Company *exceeded* the Merger Consideration in both their *Selected Public Company Trading Multiples Analysis* and *Premiums Paid Analysis*, indicating that Finjan's shares were worth up to $1.64 and $1.63, respectively.

129.    Fourth, prior to the Merger, financial analysts were bullish on Company and its future success. Investor Observer, a financial investment website, noted interest in the Company by saying in its May 18, 2020 article, "the average rating from Wall Street analysts, FNJN stock has a mean target price of $5. This means analysts expect the stock to rise 252.11% over the next 12 months." This optimism came from an aggregate analysis across the industry. The $5 price target is $3.45 above the Merger Consideration, further indicating that shareholders suffered economic loss as a result of the materially false and misleading Recommendation Statement that was utilized to procure approval of the unfair Merger.

## CLASS ACTION ALLEGATIONS

130.    Lead Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public shareholders of Finjan who were harmed by Defendants' conduct alleged herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

131.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of June 23, 2020, there were 27,832,485 shares of Finjan common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Finjan will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

        i)    whether Defendants misrepresented material information in the Recommendation Statement in violation of Section 14(e) of the Exchange Act; and

        ii)    whether Hartstein violated Section 20(a) of the Exchange Act.

c.    Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## <u>COUNT I</u>

**Against Finjan and Hartstein for Violations of Section 14(e) of the Exchange Act**

132.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

133.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order

to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

134.    Finjan and Hartstein violated this clause of Section 14(e) because they authorized the Recommendation Statement to be disseminated to Finjan shareholders to solicit them to tender their shares in the Tender Offer despite knowing that the Recommendation Statement contained untrue statements of material fact.

135.    Finjan and Hartstein knowingly allowed the Recommendation Statement to be disseminated with the above-referenced materially false and misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Merger. As the CEO of Finjan and signatory of the Recommendation Statement, Hartstein had a duty to review the Recommendation Statement before it was disseminated to the Company's shareholders and ensure that it did not contain untrue statements of material fact. Hartstein knowingly violated this duty.

136.    As Finjan's President and CEO who was intricately involved in preparing and reviewing the Recommendation Statement, orchestrating the strategic review process, and in the creation of the Company's projections, Hartstein's knowledge is imputed to Finjan. *See, e.g., Nordstrom, Inc. v. Chubb & Son*, 54 F.3d 1424, 1435 (9th Cir. 1995); *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475-76 (9th Cir. 2015); *In re Energy Recovery Sec. Litig.*, No. 15-cv-00265-EMC, 2016 U.S. Dist. LEXIS 9781, at *70-73 (N.D. Cal. Jan. 27, 2016).

137.    As a direct result of Finjan and Hartstein's preparation, review, and approval of the false and misleading Recommendation Statement, Finjan shareholders were induced to forego appraisal, tender their shares and accept the inadequate Merger Consideration. The false and misleading Recommendation Statement impeded Finjan shareholders from making a fully informed decision regarding the Tender Offer and whether to seek appraisal, and was an essential link in consummating the Merger, which deprived shareholders of fair value for their Finjan shares.

138.     Prior to the dissemination of the materially false and misleading Recommendation Statement, Hartstein and Finjan were aware of the above-referenced facts and financial information regarding Finjan's expected future financial performance and the true value of the Company, which indicate that the Fairness Opinion Projections were unreasonably low and that the Merger was financially unfair to the Company's shareholders.

139.     As a direct and proximate result of the materially false and misleading Recommendation Statement Hartstein and Finjan authorized to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the fair value of their shares, as discussed above) in an amount to be determined at trial.

## COUNT II

### Against Hartstein for Violations of Section 20(a) of the Exchange Act

140.     Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

141.     Hartstein acted as a controlling person of Finjan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his position as President and CEO of Finjan, he had the power to influence and control and did influence and control the decision making of Finjan, including the content and dissemination of the various statements in the Recommendation Statement that are false and misleading.

142.     Hartstein was provided with and had unlimited access to copies of the Recommendation Statement alleged by Lead Plaintiff to be false and misleading, both prior to and after it was issued, and had the ability to prevent the issuance of the false and misleading statements or cause them to be corrected.

143.     In particular, Hartstein had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised

1  the same. The Recommendation Statement and its Amendments are signed by Hartstein, and

2  Hartstein was thus directly involved in the making of the Recommendation Statement.

3       144.   By virtue of the foregoing, Hartstein violated Section 20(a) of the Exchange Act.

4       145.   As set forth above, Hartstein had the ability to exercise control over and did control

5  Finjan, which, by its acts and omissions as alleged herein violated Section 14(e). By virtue of his

6  position as a controlling person, Hartstein is liable pursuant to Section 20(a) of the Exchange Act.

7  **RELIEF REQUESTED**

8       WHEREFORE, Lead Plaintiff demands relief in his favor and against the Defendants

9  jointly and severally, as follows:

10       A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

11  Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative and Lead Counsel

12  as Class Counsel;

13       B.   Awarding Lead Plaintiff and the members of the Class compensatory, quasi-

14  appraisal, and/or rescissory damages, including pre-judgment and post-judgment interest;

15       C.   Awarding Lead Plaintiff and the members of the Class reasonable attorneys' fees,

16  expert fees, and other costs; and

17       D.   Granting such other and further relief as this Court may deem just and proper.

18  **JURY DEMAND**

19       Lead Plaintiff demands a trial by jury.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

DATED: May 11, 2021

Respectfully submitted,

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel: 212-971-1341
Fax: 212-202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

*Counsel for Lead Plaintiff and Lead Counsel
for the Putative Class*

*/s/ David E. Bower*
David E. Bower

David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Lead Plaintiff and Lead Counsel
for the Putative Class*

SECOND AMENDED COMPLAINT
CASE NO. 3:20-cv-04289-EMC