UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FINJAN HOLDINGS, INC. SECURITIES LITIGATION. | Case No. 20-cv-04289-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Docket No. 46 |

The above-referenced case is a securities action filed against Finjan Holdings, Inc. ("Finjan") and its President and CEO Philip Hartstein.[1] Lead Plaintiff (an individual, Robert Grier) asserts that Defendants violated §§ 14(e) and 20(a) of the Securities Exchange Act of 1934 based on misrepresentations related to a tender offer in which Fortress Investment Group LLC, through an affiliate, acquired all of Finjan's stock for $1.55 per share. The alleged misrepresentations were contained in the Recommendation Statement (Schedule 14D-9) and/or amendments thereto that Defendants disseminated to Finjan shareholders prior to their making a decision on whether to tender their shares in the offer. *See generally* Defs.' RJN, Ex. A (Rec. St. at 12) (stating that, the Board unanimously "determined that the Offer, the Merger and the other transactions contemplated by the Merger Agreement are fair to and in the best interests of the Company and its stockholders" and "recommended that the stockholders of the Company tender their Shares in the Offer").

Previously, the Court dismissed Lead Plaintiff's first amended complaint ("FAC") based

---

[1] Lead Plaintiff no longer sues the former members of Finjan's Board of Directors.

1  on failure to plead subjective falsity. Lead Plaintiff, however, was given leave to amend, and thus
2  he filed the operative second amended complaint ("SAC"). Now pending before the Court is
3  Defendants' motion to dismiss the SAC.

## I. FACTUAL & PROCEDURAL BACKGROUND

The gist of Lead Plaintiff's suit is that Defendants made material misrepresentations about the value of the company (*i.e.*, undervaluing it). Specifically, in the Recommendation Statement issued in June 2020, Defendants claimed that Fortress's offer of $1.55 per share was reasonable based on financial projections that Finjan would have revenues of about $166 million for the period 2020-2024.[2] However, just six months earlier, in December 2019, Defendants claimed that Finjan expected to generate approximately $200-400 million in revenue for the period 2019-2022 – and this was with respect to just one line of business (licensing and enforcement) out of three. Lead Plaintiff contends that nothing happened in the six-month period that would have warranted such a drastic reduction in the value of the company. In fact, Lead Plaintiff asserts, Finjan management made optimistic statements during the six-month period and further indicated that COVID-19 would not be an issue (*e.g.*, even if trials would be delayed, they would still take place before 2024 and thus projected revenue might be delayed but not altogether eliminated). Lead Plaintiff also maintains that third parties also viewed Finjan favorably during this six-month period. *See, e.g.*, SAC ¶ 67 (alleging that "Dmitriy Kozin, a sophisticated Finjan investor who closely followed the Company, explained in an article entitled 'COVID-19 or not, Finjan should do well,' the Company was 'realistically worth 3x more than [its then] current share price and potentially 10x more'"); SAC ¶ 129 (alleging that, in an article dated May 18, 2020, "Investor Observer, a financial investment website, noted that '"the average rating from Wall Street analysts, FNJN stock has a mean target price of $5,"' which "'means analysts expect the stock to rise 252.11% over the next 12 months'").

A.  Prior 12(b)(6) Proceedings

During the prior 12(b)(6) proceedings, the Court noted that Lead Plaintiff had to make a

---

[2] These financial projections were given to Finjan's financial advisor, Atlas, so that it could prepare a Fairness Opinion on the Fortress tender offer.

2

plausible showing of both objective and subjective falsity in order to have a viable claim. The Court did not make a definitive ruling on objective falsity. *See* Docket No. 18 (Order at 18-19) (acknowledging allegations made by Lead Plaintiff but also noting that there were facts that indicated the tender offer was fair – *e.g.*, (1) "in the months preceding the tender offer, the stock had not always performed well and/or revenues were low"; (2) "[t]he merger consideration of $1.55 per share was more than the then-current stock price"; (3) "Party B had made an offer ($1.50 per share) that was similar in value to the merger consideration, and there were no other suitors"; (4) "[u]nder the Premiums Paid Analysis (also part of the Fairness Opinion), Atlas found that the value of Finjan stock could be as low as $1.56 per share"; and (5) there was "uncertainty in the future, both because of COVID-19 and the nature of Finjan's business (patent licensing and enforcement which involves extended negotiations and at times litigation"; but ultimately not resolving the issue of objective falsity).

However, the Court held that Lead Plaintiff failed to allege a viable claim because subjectively falsity was insufficiently pled. Subjective falsity meant that Lead Plaintiff had to plead "facts giving rise to a strong inference that Defendants did not believe [the financial projections of $166 million for the 2020-2024 period] were true – *i.e.*, that Defendants *knew* that the [financial projections] were false even though they were presenting them to Atlas as true for purposes of developing the Fairness Opinion." Docket No. 41 (Order at 20) (emphasis in original). The Court noted that, "[i]n a recent opinion, the Ninth Circuit underscored that, if a 'complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter.'" Docket No. 41 (Order at 20). Here, Lead Plaintiff's FAC did not explain why Defendants would endorse the financial projections as true if they actually believed them to be false.

> The FAC does not contain any allegations suggesting that Defendants would secure unique benefits not afforded to shareholders if the tender offer were to go through. Nor are there any other allegations suggesting that Defendants' interests regarding the tender offer were not aligned with those of the shareholders. In fact, two Defendants were independent directors (notably, the two who made up the Transaction Committee), and thus would appear to have no vested interest one way or the other with respect to the tender offer. This lack of any motive is highly problematic in light

3

> of *Prodanova* [the recent Ninth Circuit case].
>
> Moreover, the failure to allege a plausible motive cannot be overlooked here because there are not compelling and particularized facts alleged in support of the claim of fraudulent intent. As noted above, the independent board members on the Transaction Committee supported the tender offer. Furthermore, there was concrete market evidence that the merger consideration of $1.55 per share was reasonable – *i.e.*, at or about the same time of Fortress's offer, Party B had made an offer of $1.50 per share. So did Fortress. There were no other interested parties despite Atlas's marketing efforts. This evidence of what the actual market was willing to offer is direct evidence of market value unlike the circumstantial and interpretive approach of, *e.g.*, Atlas's Premiums Paid Analysis and Selected Public Company Trading Multiples Analysis (which, unlike the Discounted Cash Flow Analysis, were not derived from the [allegedly false financial projections]).

Docket No. 41 (Order at 21).

Because subjective falsity was not adequately pled, the Court dismissed the securities claims brought by Lead Plaintiff but gave him leave to amend.

B.   <u>Allegations in the SAC</u>

In the operative SAC, Lead Plaintiff repeats many of the same allegations as contained in the prior FAC. He has, however, added some new allegations. The main allegations that have been added to the SAC are (1) a more detailed recounting of the sales process that took place before Fortress made its offer of $1.55 per share and (2) an explanation of why Mr. Hartstein had a motive to make misrepresentations about the value of the company. In essence, the recounting of the sales process explains why Mr. Hartstein had a motive to lie.

In a nutshell, Lead Plaintiff contends that, during the sales process, "two main bidders for Finjan emerged": Party B and Fortress. Opp'n at 4. Finjan management (*i.e.*, Mr. Hartstein, according to Lead Plaintiff) repeatedly rejected Party B's offers, so many times that (1) at one point (September 2019), Party B wrote a letter to the Finjan Board criticizing the sales process and expressing concern about Finjan dealing exclusively with Fortress and (2) at another point (February 2020), Party B wrote a letter to the Board sating that it wanted to deal with the Board directly. In late February 2020, the Finjan Board decided to close the strategic review process and, in March 2020, that information was publicly announced, with Mr. Hartstein stating that the company was confident in moving forward as an independent entity. However, shortly thereafter,

4

in April 2020, Party B informed a Finjan Board member that it intended to purchase a significant number of shares of Finjan, *i.e.*, to carry out a hostile takeover. The Board then asked management to perform a liquidation value analysis. Mr. Hartstein did not like either of these two options. For example, if Party B got a toehold, then it might press for his departure from the company based on its displeasure with how the sales process had been conducted. At the very least, continuing as CEO of a publicly traded company with "an aggressive and agitated stockholder hanging over his shoulder" was not desirable. SAC ¶ 112; *see also* Opp'n at 12 (arguing that "Party B's threat completely changed the calculus for Hartstein[;] [c]ontinuing on Finjan's path forward as an independent, publicly-traded entity – which Hartstein had just declared to be in shareholders' best interests – was no longer a desirable option for Hartstein once an agitated Party B indicated it was going to become a large shareholder"). Likewise, the liquidation option was not desirable; Mr. Hartstein would be out of a job in that scenario. Mr. Hartstein, therefore, reached out to Fortress to see if it still had an interest in acquiring Finjan. *See* SAC ¶ 45 (alleging that "[t]here is no indication in the Recommendation Statement that the Board authorized such a communication" – *i.e.*, Mr. Hartstein acted on his own). In short, Mr. Hartstein wanted Fortress to acquire Finjan so that he could continue in his lucrative position, with the "obvious benefits [of] leading a private company, including avoiding the strict formalities, legal requirements, and oversight that come with serving as the CEO of a publicly traded corporation." SAC ¶ 113.

In the SAC, Lead Plaintiff also suggested that Mr. Hartstein was motivated to lie because, if Fortress were to acquire Finjan, then he would stand "to receive [significant] change in control benefits" – *i.e.*, a "golden parachute compensation . . . worth $1,338,233 in total, including $310,000 in restricted stock units." SAC ¶¶ 117-18; *see also* Rec. St. at 9 (chart showing golden parachute compensation for officers). Lead Plaintiff, however, backed away from this argument in his opposition brief and at the hearing, implicitly acknowledging Defendants' criticism that (1) Mr. Hartstein did not get any golden parachute compensation as a result of the merger and (2) at most he stood to gain only $310,000 from the merger based on accelerated vesting of equity grants. *See* Opp'n at 13 (arguing that "the centerpiece of Plaintiff's motive theory" is not the

5

1  golden parachute compensation; rather, "Hartstein's primary motive was maintaining his
2  leadership position at Finjan without having to deal with and worry about Party B" and the
3  "$310,000 Defendants admit Hartstein stood to gain from the Merger with Fortress was [just] a
4  nice *added bonus* for Hartstein") (emphasis in original).

C.    Sales Process

Although the Court must give Lead Plaintiff's allegations about the sales process due consideration, it is clear that (1) the allegations about the sales process come from the Recommendation Statement and (2) Lead Plaintiff has focused on certain events as described in the Recommendation Statement but ignored others. Defendants contend that Lead Plaintiff is not entitled to ignore the other events, emphasizing that, even at the 12(b)(6) phase, the Court may consider the contents of the Recommendation Statement because of the incorporation-by-reference doctrine.

The Court agrees with Defendants. The incorporation-by-reference doctrine "is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Id.* In the instant case, incorporation by reference of the Recommendation Statement is appropriate. Lead Plaintiff has relied extensively on the document in recounting the sales process. *See* SAC ¶ 22 *et seq.* (recounting the sales process). Lead Plaintiff selectively cites from the Recommendation Statement to his benefit but ignores those parts of the document that do not favor him, precisely what *Khoja* says a plaintiff may not do. Importantly, Lead Plaintiff admitted at the hearing that he has no basis to dispute the accuracy of the Recommendation Statement's recitation of the sales process. *Cf. id.* at 1003 (stating that, "unlike judicial notice, a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6),'" but "it is improper to assume the truth of an incorporated document *if such assumptions only serve to*

6

*dispute facts stated in a well pleaded complaint*") (emphasis added). Accordingly, the Court considers the full recitation of the chronology of the sales process.

Below is a fuller and more complete pictures of the sales process, as described in the Recommendation Statement. *See* Defs.' RJN, Ex. A (Rec. St. at 13 *et seq.*). The Court emphasizes that its focus below is on Finjan's dealings with Party B and Fortress, given that they were ultimately the two most interested parties. However, notably there were other companies that also expressed interest in Finjan, including Party A, Party, C, and Party D, although they eventually dropped out of the sales process after doing some due diligence. Dealings with Party A appeared to end in late 2018; with Party D in mid-2019; and with Party C ended in the latter half of 2019. In the end, only Party B and Fortress maintained an interest in Finjan.

- 3/7/2018. The Board authorized Mr. Hartstein "to (i) continue exploring opportunities for a strategic relationship with another patent monetization company, (ii) explore acquiring additional patents, and (iii) engage with an investment bank regarding acquisition opportunities." Rec. St. at 13.
- 5/2/2018. The Board authorized the formation of a Transaction Committee, consisting of two independent directors (Mr. Benhamou and Mr. Southworth). "The Transaction Committee, in coordination with the Company's Chairman, Daniel Chinn, was delegated the power to oversee a sales process and make certain day-to-day decisions but was not empowered to ultimately reject or approve any transaction." Rec. St. at 13.
- 6/16/2018. The Board engaged Atlas, a financial advisor, to assist it "in identifying, reviewing and implementing strategic alternatives." Rec. St. at 13-14.
- 8/22/2018. Beginning on this date, Atlas contacted "more than 50 parties to explore interest in a transaction with the Company, including a sale of the Company, potential acquisitions by the Company and joint venture proposals involving combined management of patent portfolios. Of these, 11 parties entered into confidentiality agreements with the Company, including Fortress." Rec. St. at 14. Those 11 parties were given Finjan's financial projections, including revenue

and operating income through 2022.  *See* Rec. St. at 14.

- 9/19/2019.  "Party B, a strategic acquiror, informed Atlas that it would have potential interest in pursuing an acquisition of the Company via a stock-for-stock merger."  Rec. St. at 14.

- 10/3/2018.  "The Board discussed the complicated nature of exploring a stock-for-stock transaction with Party B and determined that it should continue discussions with the other interested parties rather than focus on the more complicated structure of a transaction with Party B."  Rec. St. at 14.  Atlas then informed Party B that "the Board was not interested in a stock-for-stock transaction with Party B at that time."  St. at 15.

- 2/6/2019.  "Party B submitted an unsolicited non-binding proposal to the Company to acquire all of the Company's stock in exchange for $1.86 per share in cash and a contingent value right that would pay out an undetermined amount based on Company performance over the next five years."  Rec. St. at 17.

- 2/11/2019.  The Transaction Committee and Mr. Chinn discussed the Party B offer.  "The Transaction Committee viewed the offer as inadequate with regard to consideration and structure."  Rec. St. at 17.  Mr. Chinn informed the Board that the Committee had recommended that the offer be rejected.  Several days later, Finjan told Party B that it was rejecting the proposal.  *See* Rec. St. at 14.

- 5/10219.  Atlas began to solicit bidders for a sale of Finjan "at the direction of the Board."  Rec. St. at 17.  Atlas contacted seven parties, including Party B and Fortress.  *See* Rec. St. at 17.

- 6/19/2019.  Fortress indicated to Atlas that it was "interested in a transaction with the Company in the high $2.00s to up to $3.00 per share range."  Rec. St. at 18.

- 6/26/2019.  A Board member informed the Board that he had had a call "with one of the Company's stockholders informing him that Party B had contacted the stockholder regarding coordinating on a transaction with the Company."  Rec. St. at 18.

8

- 8/2019. "[M]embers of management and Atlas held multiple calls with [*inter alia*] Fortress [and] Party B." Rec. St. at 18.
- 8/27/2019. "Fortress delivered to Atlas a non-binding proposal to acquire all of the stock of the Company for a price in the range of $3.00 to $3.40 per share in cash, along with a request for the exclusive right to negotiate with the Company through October 11, 2019." Rec. St. at 18.
- 8/29/2019. "Party B communicated an oral offer to the Company to purchase all shares at $3.00 per share." Rec. St. at 18.
- 8/30/2019. "[T]he Transaction Committee met with members of management and legal and financial advisors present and authorized Atlas to continue negotiating with Party B and Fortress to increase the offer price and remove any contingencies." Rec. St. at 18.
- 8/30-9/11/2019. Atlas held multiple conversations with Party B and Fortress.
- 9/11/2019. "Fortress delivered a revised non-binding letter of intent revising its per share proposal to $3.25 in cash and requesting 14 days of exclusivity. Party B indicated it would not be able to increase its offer price beyond $3.00 without the benefit of additional due diligence." Rec. St. at 19.
- 9/17/2019. Finjan and Fortress "executed a non-binding letter of intent providing Fortress with the exclusive right to negotiate with the Company through October 1, 2019, with the possibility of an extension through October 8, 2019." Rec. St. at 19.
- 9/20/2019. "Party B sent a letter to the Board criticizing the Company's sales process and expressing concern that the Company entered into exclusive negotiations with another party despite Party B's continuing interest in a transaction. Party B also alleged that it had previously communicated its willingness to consider making an offer at $3.50 per share if it could conduct three weeks of additional due diligence and indicated that it had not withdrawn its offer of $3.00 per share." Rec. St. at 19.
- 9/27/2019. The Board approved an extension of the exclusivity period for Fortress

9

through October 11, 2019. *See* Rec. St. at 19.

- 10/5/2019. Fortress informed Atlas that, after due diligence, "it was reducing its offer from $3.25 per share to a range of $2.30 to $2.60 per share. The reduction in the offer price terminated the exclusivity period under the terms of the letter of intent." Rec. St. at 19.

- 10/10/2019. The Board authorized Atlas to re-engage with Party B "on the condition that Party B would agree to a customary standstill arrangement to prevent it from acquiring Company shares without approval from the Board. The Board required a customary standard arrangement to ensure Party B would participate in a negotiated transaction so that the Board could direct an orderly process in the best interests of stockholders." Rec. St. at 19.

- 11/14/2019. Finjan and Party B entered into an agreement that restricted "Party B from acquiring more than 6% of the Company's outstanding shares without Board approval prior to March 30, 2020 and providing Party B with the exclusive right to negotiate with the Company through December 4, 2019." Rec. St. at 20.

- 12/5/2019. "Party B provided a letter to Atlas offering $2.75 per share and requiring the Company to maintain a cash balance of $48.3 million as of December 31, 2019. The Company's cash balance at September 30, 2019 was approximately $34 million." Rec. St. at 20.

- 12/5/2019. "[T]he Board met with members of management and legal and financial present. After discussion, the Board determined to reject Party B's offer because the Company was unlikely to meet the minimum cash balance requirement. The Board further instructed Atlas to contact each of Party B and Fortress and request 'best and final' bids." Rec. St. at 20.

- 12/12/2019. "Party B reiterated its offer to acquire the Company at $2.75 per share but adjusted its December 31, 2019 minimum cash balance requirements down from $48.3 million to $35 million." Rec. St. at 20.

- 12/13/2019. Fortress informed Atlas that it would not submit another proposal at

that time. *See* Rec. St. at 20.

- 12/18/2019. Finjan and Party B signed letter agreement giving Party B the exclusive right to negotiate with the company through January 10, 2020. That date was later extended to January 16, 2020. *See* Rec. St. at 20.

- 1/15/2020. Party B informed Finjan's attorneys that it was unwilling to proceed without a fairness opinion which would take several weeks to prepare. Party B asked for an extension of the exclusivity period through February 3, 2020. The extension was given. *See* Rec. St. at 21.

- 1/31/2020. Party B informed Finjan's attorneys that "it was pausing further pursuit of the Company" because of an adverse decision that had issued in Finjan's lawsuit against another company (Checkpoint). Rec. St. at 21.

- 2/3/2020. "Party B sent a letter to the Board indicating that Party B wished to deal directly with the Board on any further discussion regarding a potential transaction with the Company." Rec. St. at 21.

- 2/18/2020. Two Board members met with Party B. "Party B orally proposed a transaction whereby Company stockholders would receive a distribution of the Company's current cash and a contingent value right representing the right to receive a percentage of the Company's future revenue." Rec. St. at 21. The directors and Party B continued to communicate through March 3, 2020.

- 2/26/2020. The full Board "authorized the Company to publicly announce the close of [the sales/strategic review] process so that management and the Board could better focus on operating the Company's business." Rec. St. at 21.

- 3/4/2020. Finjan publicly announced the close of the strategic review process. *See* Rec. St. at 21.

- 3/18/2020. Finjan's common stock closed trading at $0.78 per share. *See* Rec. St. at 21.

- 4/1/2020. "Party B informed Mr. Chinn [the Chairman of the Board] of its intent to purchase additional shares of the Company in the market that would trigger a

11

      Schedule 13D filing by Party B.[3]  Party B also noted that it was interested in acquiring the Company at $1.50 per share and asked for an opportunity to reengage with the Company prior to acquiring more Company shares in the market."  Rec. St. at 21.

- 4/5/2020.  The Board met to discuss the $1.50 per share offer from Party B.  "The Board asked management to perform a liquidation value analysis to determine whether it would be more desirable for the Company to liquidate than to sell at $1.50 per share to Party B."  Rec. St. at 22.

- 4/6/2020.  Mr. Chinn sent a letter to Party B, "noting the restrictions in applicable law and the confidentiality agreement between the parties that prevented Party B from acquiring Company shares when in possession of material, non-public information regarding the Company.  In further correspondence, Party B confirmed its interest in pursuing a transaction with the Company at $1.50 per share and requested two weeks of additional exclusivity."  Rec. St. at 22.

- 4/12/2020.  "[M]embers of management contacted representatives of Fortress to inquire whether they had an interest in reengaging in acquisition discussions."  Rec. St. at 22.

- 4/13/2020.  Finjan and Party B entered into an agreement that gave Party B exclusivity through April 20, 2020.  *See* Rec. St. at 22.

- 4/21/2020.  After the exclusivity period expired, Atlas contacted Fortress "to explore whether it had interest to reengage in discussions to acquire the Company."  Rec. St. at 22.  Through early May 2020, members of the Board continued to communicate with Party B.  Rec. St. at 22.

- 4/28/2020.  Finjan provided Fortress with quarterly financial projections for the remainder of 2020.  The same information had previously been given to Party B.

---

[3] *See also* https://www.investor.gov/introduction-investing/investing-basics/glossary/schedules-13d-and-13g (last visited 9/9/2021) ("When a person or group of persons acquires beneficial ownership of more than five percent of a voting class of a company's equity securities registered under the Securities Exchange Act, they are required to file a Schedule 13D with the SEC.").

*See* Rec. St. at 22.

- 4/29/2020. Party B stated that "it was not willing to pursue a transaction at $1.50 per share and proposed restructuring the transaction as an asset purchase. Party B also indicated that it would need to perform further due diligence on the Company." Rec. St. at 22.

- 4/30/2020. Fortress confirmed its interest in reengaging in the process. *See* Rec. St. at 22.

- 5/4/2020. The Board met and discussed both the interactions with Party B and Fortress. "Given the current interest from Fortress and the potential drawbacks and complications of an asset purchase structure, the Board concluded that pursuing an asset purchase transaction with Party B would not be in the best interests of stockholders. The Board instructed Atlas to continue to explore whether Fortress had an interest in a transaction." Rec. St. at 22.

- 5/5/2020. Fortress sent a written nonbinding letter of intent, proposing to acquire Finjan for $1.50 per share. Exclusivity through June 19, 2020, was also contemplated. *See* Rec. St. at 23.

- 5/8/2020. Fortress increased the offer to $1.55 per share in a nonbinding letter of intent "which contained an exclusive right to negotiate . . . until June 8, 2020." Rec. St. at 23. Both parties signed that letter. *See* Rec. St. at 23. On the same day, Finjan's common stock closed trading at $1.24 per share. *See* Rec. St. at 23.

- 6/8/2020. The parties extended exclusivity so that they could continue to negotiate and finalize a merger agreement. *See* Rec. St. at 24.

- 6/9/2020. The Board held a meeting. It received a presentation from its legal advisors as well as a presentation from Atlas, who opined that the merger consideration was fair to the shareholders. The Board unanimously approved the merger agreement and recommended that shareholders tender their shares. *See* Rec. St. at 24. On the same day, Finjan's common stock closed trading at $1.33 per share. *See* Rec. St. at 24.

13

- 6/10/2020. The merger agreement was executed and publicly announced. *See* Rec. St. at 24.
- 6/24/2020. Finjan filed the Recommendation Statement with the SEC.

## II.   DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

In addition to Rule 8(a)(2), Rule 9(b) governs in the instant case. This is because, as the Court explained in its prior 12(b)(6) order, Lead Plaintiff's claims are grounded in fraud (even though a § 14(e) violation may be based on negligence). *See* Docket No. 41 (Order at 11-12).

Finally, as the Court explained in its prior order, because Lead Plaintiff must plead not only objective falsity but also subjective falsity (given the nature of his claims), the PSLRA

14

requires that there be a "strong inference" of the requisite state of mind.[4]

In the pending motion, Defendants argue that Lead Plaintiff has failed to adequately plead objective falsity, subjective falsity, and loss causation.

B.   Falsity

Regarding objective falsity, Defendants largely make the same arguments that they did in the prior 12(b)(6) proceedings. And as before, the Court continues to have serious questions as to whether Lead Plaintiff has sufficiently alleged objective falsity. Weighing against Lead Plaintiff is the undisputed fact that the offer made by Fortress ($1.55 per share) was similar to the offer made by Party B ($1.50 per share). *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 399 (S.D.N.Y. 2020) (rejecting plaintiff's argument that financial projections were false because they not consistent with analyst expectations: "[t]he analyst predictions averred to were estimates of what potential buyers would agree to offer Wesco in a merger [b]ut there is other, even stronger evidence of what potential buyers would agree to offer – what the potential buyers did offer"; adding that "several prospective bidders [actually] dropped out and decided not to offer anything, and no bid higher than Platinum's was ever made").

Moreover, the full picture of the sales process as described above indicates that the similar valuation was not mere happenstance but rather was reflective of the true market value of Finjan's stock. As reflected above, there was a concerted effort on the part of Finjan to reach out to 50 parties; of those, 11 were interested enough to enter into confidentiality agreements; and of those, 5 parties (Parties A-D and Fortress) continued with due diligence for at least a period of time. Ultimately, all parties except for Party B and Fortress fell out of the picture, presumably concluding that they had no interest in Finjan. Finjan then engaged in extensive negotiations with

---

[4] In its prior order, the Court noted that a § 14(e) claim can be predicated on negligence but that, as a factual matter, Lead Plaintiff had put forward a theory that Defendants knew that the financial projections given to Atlas were false. In addition, the Court noted in its prior order that, where opinions are at issue, a plaintiff must plead not only objective falsity but also subjective falsity, which is essentially a state-of-mind requirement. *See* Docket No. 41 (Order at 12-13, 18). *See* Docket No. 12 (Order at 12-13) ("The allegations in the FAC are not suggestive of negligence or even gross negligence. Rather, the FAC alleges that Defendants *knew* the Multiyear Projections were false.") (emphasis in original); Docket No. 41 ("Lead Plaintiff does not dispute that, in the case at bar, he must allege facts supportive of not only objective falsity but also *subjective* falsity, which is essentially a state-of-mind requirement.") (emphasis in original).

both Party B and Fortress, each knowing that the other was a competitor during the process. Even though there was competition, the offers from Party B and Fortress both decreased during the process, coming from a price at or above $3.00 per share down to the range of $1.50-$1.55 per share (which was more than the $1.33 per share the stock was commanding the day before the merger agreement was executed). Thus, after exposure to the market, the competitive market forces strongly indicated that the true value of the shares was in the $1.50 to $1.55 range. The Ninth Circuit memorandum disposition in *In re Ocera Therapeutics, Inc. Securities Litigation*, 806 F. App'x 603 (9th Cir. 2020), while not precedential, is instructive. In discussing loss causation, the court took note of the plaintiff's theory that the true value of the company's stock was more in line with financial projections in June 2017 rather than later projections in November 2017 (the latter made in connection with the challenged merger) but found that theory speculative. The court pointed out that "numerous potential acquirers, including those that did due diligence on the company during the period around or after the June Projections, lost interest in acquiring [the company], leaving only Mallinckrodt plc, which was still willing to pay more than the existing market price of $1.00 per share on the date of the entry into the merger agreements." *Id.* at 605. In short, the Ninth Circuit found the sales process indicative of the true value of the acquired company.

For the reasons stated above, the Court has serious doubts as to whether Lead Plaintiff has sufficiently alleged objective falsity (and correlative loss causation). That being said, it need not rule definitively on objective falsity because there is a lack of subjective falsity plea here. Because there was a true and tested sales process in which Party B and Fortress heavily competed against one another (as well as others) and ultimately gave similar offers, Lead Plaintiff's position that Defendants (in particular, Mr. Hartstein) knew or should have known that $1.50 per share was an undervaluing of the company is speculative and insufficiently pled, just as it was with the FAC.

Lead Plaintiff's new allegations in the SAC regarding Mr. Hartstein's motive to give false financial projections to Atlas is of no help. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097 (9th Cir. 2021) (stating that, "if [a] complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter").

16

Notably, Lead Plaintiff conceded at the hearing that Mr. Hartstein would not get a golden parachute of approximately $1 million if the merger were to go through; under his employment agreement, the golden parachute would only be available to Mr. Hartstein if, after a change in control, he were *terminated* under certain circumstances. *See* Rec. St. at 8-9; Employment Agreement § 7(c) (providing that, "[i]n the event of a Change in Control approved by a majority of Incumbent Directors, provided that Employee's employment is terminated by the Company without Cause . . . or by Employee with Good Reason, or the Company's non-renewal of this Agreement . . . on or within ninety (90) days following such Change in Control, then Employee shall . . . be entitled to receive: (A) the Termination Benefits; and (B) 100% accelerated vesting with respect to Employee's then outstanding, unvested equity awards").

To be sure, Lead Plaintiff theorizes that Mr. Hartstein had a motive to lie because he wanted to keep his job and that Mr. Hartstein did not want Party B to gain control over Finjan because, if it did, Party B would likely get him fired.[5] This theory is predicated on the assumption that Party B was hostile to Mr. Hartstein because of the way the sales process was being handled. But the only evidence to which Lead Plaintiff has pointed to support its claim that Party B was hostile to Mr. Hartstein is the letter that Party B sent to the Board in February 2020, indicating that it "wished to deal directly with the Board on any further discussion regarding a potential transaction with the Company." Rec. St. at 21. Lead Plaintiff asserts that it can be inferred that Party B did not want to engage with Mr. Hartstein, but Lead Plaintiff has not explained why it is reasonable to infer that Party B was targeting Mr. Hartstein or that it viewed him in particular as an obstacle in the sales process as opposed to, *e.g.*, management generally, the Transaction Committee, or Finjan's attorneys. There is no indication that the sales process was not being handled by the Transaction Committee, which appeared to be assigned the task of overseeing the sales process, *see* Rec. St. at 13, or Finjan's attorneys who appeared to be directly communicating with Party B. In fact, the Recommendation Statement indicates that Party B's letter asking for

---

[5] At the hearing, Lead Plaintiff maintained that, even if a termination would enable Mr. Hartstein to get the $1 million golden parachute (or if he could get the $1 million golden parachute for other reasons), he had no real interest in the money and would have preferred to stay on the job with Finjan because he had founded the company.

17

direct dealing with the Board was because it had been engaging with Finjan's counsel, Perkins Coie, during that specific period in time. *See, e.g.*, Rec. St. at 20-21 (noting that, on January 9, 2020, "[r]epresentatives of Perkins Coie reviewed fiduciary matters with the Board and updated them as to the ongoing negotiations with Party B on the definitive merger agreement"; that, on January 15, 20210, "Party B's legal counsel informed representatives of Perkins Coie that Party B's board of directors was unwilling to proceed with the transaction without receiving a fairness opinion"; that, on January 31, 2020, "representatives of Party B informed Perkins Coie that it was pausing further pursuit of the Company given the adverse decision in the Company's case against Checkpoint"; and that, on February 3, 2020, "Party B sent a letter to the Board indicating that Party B wished to deal directly with the Board on any further discussion regarding a potential transaction with the Company").[6] Lead Plaintiff points to no document establishing Mr. Hartstein was the point person for Finjan in negotiating with Party B.

Finally, although Mr. Hartstein would, under the merger agreement, stand to gain $310,000 from the accelerated vesting of equity grants (RSUs), that was not a benefit unique to him; any employee with RSUs was entitled to that benefit. *See* Rec. St. at 9 ("[E]ach outstanding award of Company restricted stock units will be vested in full as of immediately before the Effective Time and will be canceled and converted automatically into the right to receive an amount of cash, without interest, equal to (A) the Merger Consideration multiplied by (B) the number of Shares subject to such Company restricted stock units immediately before the Effective Time."). *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (agreeing with lower court that plaintiffs

---

[6] The Court also notes that it is far from clear that there was hostility between Party B and Mr. Hartstein and/or Finjan. As Defendants point out, even if Mr. Hartstein specifically reached out to Fortress on April 12, 2020, that was not necessarily because Mr. Hartstein feared acquisition by Party B, given that *the following day*, April 13, 2020, Finjan and Party B "entered into a letter agreement providing Party B the *exclusive* right to negotiate with the Company through April 20, 2020." Rec. St. at 22 (emphasis added). Lead Plaintiff contends that this was a tactical move on the part of Finjan; under the letter agreement, Party B also agreed to a standstill, which meant it could not seek to acquire capital in the market to pursue a hostile takeover of Finjan, and, in the meantime, Mr. Hartstein prepared to have accelerated negotiations with Fortress. But this theory is sheer speculation. Little would seem to be gained by just a one-week standstill. Moreover, Lead Plaintiff has not addressed Defendants' contention that – as Finjan told Party B – "restrictions in applicable law and the confidentiality agreement between the parties . . . prevented Party B from acquiring Company shares when in possession of material, non-public information regarding the Company." Rec. St. at 22.

did not sufficiently allege motive – *e.g.*, "plaintiffs have not pointed to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders, not just the defendant directors specifically"); *cf. Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (stating that "evidence of a personal profit motive on the part of officers and directors contemplating a merger is insufficient to raise a strong inference of scienter" because such motive is present in almost every merger – *i.e.*, officers and directors will usually reap financial benefits). Indeed, if Mr. Hartstein wished to maximize the benefit to be obtained from his RSUs, if anything, he had an incentive to get a *higher* tender offer (per share) from Fortress (or any other suitor) because the value of the RSUs was based on the merger consideration per share. It was thus contrary to his financial interest in his RSUs to undervalue Finjan shares.

Here, there is no particularized evidence supporting Lead Plaintiff's speculation that Mr. Hartstein had a motive to undervalue Finjan's stock in order to induce Fortress to acquire Finjan as a way to thwart Party B. Accordingly, the Court concludes that, as before, Lead Plaintiff has failed to adequately allege subjective falsity. Because the Court previously gave Lead Plaintiff an opportunity to amend to address this deficiency but the deficiency remains, the dismissal is with prejudice.

### III.   CONCLUSION

Defendants' motion to dismiss is granted. This order disposes of Docket No. 46.

The Clerk of the Court is directed to enter a final judgment in accordance with this opinion and close the file in the case.

**IT IS SO ORDERED**.

Dated: September 13, 2021

_____
EDWARD M. CHEN
United States District Judge